474 P.2d 116

**In re George BRIDWELL,
Disciplinary Proceeding.**

No. 11546.

Supreme Court of Utah.

Aug. 31, 1970.

Crockett, C. J., dissented and filed opinion with which Callister, J., concurred.

Ellett, J., concurred and filed opinion.

John L. Black, Salt Lake City, for Bridwell.

**2**

Marvin J. Bertoch, Richard R. Boyle, Salt Lake City, for Utah State Bar.

PER CURIAM (with two Justices dissenting):

Pursuant to a disciplinary proceeding, the Utah State Bar recommended that George E. Bridwell, an attorney, be disbarred from the further practice of law in this State. This matter is before us for a determination of what penalty, if any, should be imposed upon the attorney.

It has been the policy of this court to look upon the findings and recommendations of the Utah State Bar with indulgence;[1] and while we are still of the opinion that the findings of the Utah State Bar should be adopted by this court unless they appear to be arbitrary or not in accord with the preponderance of the evidence, yet we do not consider the recommendations of punishment made by the Bar to be in the same category as we do their findings of fact, because it is our responsibility to discipline an erring attorney, and we cannot delegate that duty to others. The Utah State Bar makes its recommendations upon a reading of the printed record of proceedings had before committees and not before the individual commissioners of the State Bar. We are, therefore, in an equally good position to evaluate the situation as are the commissioners.

We have carefully considered the evidence given before the investigating committee and considered the length of time which had elapsed between the alleged misconduct and the conclusion of the hearing and are of the opinion that a suspension of one year from the practice of law would be an adequate amount of punishment to be imposed upon Mr. Bridwell, together with a requirement that he pay to the Utah State Bar the actual costs incurred in connection with the disciplinary proceedings.

It is, therefore, ordered that George E. Bridwell be suspended from the practice of law in this State for a period of one year from the issuance of the remittitur, and that in addition thereto he be required to reimburse the Utah State Bar for the actual expenses incurred in connection with this disciplinary proceeding.

CROCKETT, Chief Justice (dissenting):

It is appreciated that the consideration this court gives a recommendation of the Bar Commission in a disciplinary proceeding is not the same as the review of a judgment of a trial court, nor of an order of an administrative agency.[1] Nevertheless, it is my opinion that for the same reasons that presumptions of verity are indulged in favor of those judgments and orders,

---

1. In re Fullmer, 17 Utah 2d 121, 405 P.2d 343.

1. In re Fullmer, 17 Utah 2d 121, 405 P.2d 343; cf. In re MacFarlane, 10 Utah 2d 217, 350 P.2d 631.

some deference should be indulged to the findings and recommendations of the Bar Disciplinary Committee and the State Bar Commission; and that accordingly, we should assume that they believed those aspects of the evidence, and the reasonable inferences to be drawn therefrom, that support their findings and recommendations; and that we therefore should survey the evidence in that light, and sustain their findings and recommendations unless it appears that they have acted capriciously, arbitrarily or unreasonably.

This disciplinary proceeding against the respondent George E. Bridwell is based upon charges of misdoings in handling the affairs of one Eugene Wagner. It should be kept in mind that the question whether and to what extent Wagner may have been involved in blameworthy conduct is not our primary concern in this proceeding. Assuming it to have been so in whatever degree, that should provide no basis for an attorney to aid and abet him, much less to take advantage of such a situation and manipulate it to his own gain. This record covers their business over several years. It would be impractical to include in this opinion any extensive detail of the facts except in brief summary of certain salient aspects thereof as found by the Commission:

(1) Wagner was in fear because of apprehension over income taxes and went to Switzerland; (2) he placed his trust in Bridwell to take care of his affairs; (3) Bridwell, knowing the situation Wagner was in and how difficult it would be for him to ascertain and cope with any misdoings of Bridwell, betrayed his trust and exerted efforts to keep Wagner frightened and in exile; (4) in doing so he employed the withholding of information and misrepresentation as to facts; (5) meanwhile he was taking for himself all of the money from Wagner's enterprise he could get hold of and failing to account for it. The major item was a refund of $15,520 from the federal government about which respondent withheld information, and later made false representations and failed to account until compelled to do so; and similarly with respect to an item of $4,000 repayment of a loan from the Metropolitan Finance Company.

It is deemed appropriate to set forth certain of the Bar Commission's findings relating to the issue here involved because they reflect the facts clearly shown by the record:

a. That the attorney in the cablegrams and letters offered in evidence, *used threats and coercion* without explanation to extract an additional $2,000.00 fee; *that no emergency circumstances existed justifying the coercion exercised.* [Referring to exhibits 10, 11, 12, 13, 14 and 15].

b. That the attorney did not properly account for the sums received from Dunn

& Bradstreet as indicated by exhibit 28 for $225.50, exhibit 29 for $79.00, and exhibit 30 for $78.44. The proof does not establish that other funds apparently remitted by Dunn & Bradstreet were in fact received by the attorney.

That the attorney with authority to incur the expenses of a trip to Switzerland, took $4,000.00 of the repayment made by Metropolitan Finance Company and used this money for that trip, and *thereafter never made any accounting to his client* itemizing the expenditure of the $4,000.-00. That near October 9, 1961, *the Federal government refunded to the attorney $15,520.00 for his client; that the client made repeated requests of the attorney for an accounting showing the disbursement of said funds, but that the attorney never made any accounting to the client.* That the attorney advised the client that the funds received on the government refund were deposited in a trust account for the benefit of Precisa and Wagner *which statement was untrue.* That after repeated requests by the client for an accounting one was provided by Accountant Nielson on October 29, 1962, as reflected in exhibit. 36, indicating *the monies had previously been disbursed principally to the attorney* and Accountant Nielson.

c. The attorney's request to a government auctioneer to withhold a chandelier from the sale and the attorney's purchase of the chandelier on the following day when no other competitive bidders were expected to be present was a representation of conflicting interests.

\*     \*     \*     \*     \*     \*

e. * * * that the attorney did in fact represent both Schubach and Wagner and Precisa companies, and there is evidence that he related to Wagner and Precisa Company that he had taken steps to protect the building so that they could regain possession. That the attorney in exercising the option on behalf of Precisa and in signing that interest to Schubach who subsequently made a $10,000.00 profit on the transaction was contrary to the best interest of his client, Wagner and Precisa. That the interests of Schubach and Precisa and Wagner were hostile to each other, and the attorney's representation of both parties constituted a breach of his duty to his client and a representation of conflicting interests.

\*     \*     \*     \*     \*     \*

g. That the attorney's withdrawal of sums of money (except the original $14,-000.00) from the client's corporate assets for additional legal fees was *without the authorization or knowledge of the client.* That there was some discussion between the attorney and the client that there may be additional sums to be paid on the attorney's fees, but there was no authorization nor knowledge as to withdrawal or use of funds under the attor-

ney's control as attorney's fees exceeding the $14,000.00 original figure. That the records indicate that *$19,425.00 and $4,000.00 had already been taken by the attorney before the first trip to Switzerland when the necessity for additional attorney's fees were verbally discussed.*

\*    \*    \*    \*    \*    \*

\*  \*  \*  That the action of the attorney in preparing and securing the adoption of minutes of the stockholders meeting in Switzerland were for the protection of the attorney in an effort to exonerate himself from any wrongdoing or excuse any previous conduct for which he felt he might ultimately have some responsibility to his client.

h.   That the attorney accepted labor and materials for the improvement of the attorney's home from a contractor tenant of the client's corporation and then credited the tenant with the value of said labor and materials on the tenant's rent, which rent should have been paid to the client's corporation.

In supplementation of the foregoing findings the following portion of the record is quoted which clearly indicates that Mr. Bridwell was taking unfair advantage of the difficult situation his client was in to benefit himself:

MR. BERTOCH:  \*  \*  \*  referring to exhibit 10, which is August 3, 1961,

Mr. Bridwell said:

Received your letter of July 26, the contents noted. *Under no circumstances are you to return now.* New developments make mandatory you send $2,000 to me at once. Personal conference urgent and imperative. Further letters useless. Your continued total confidence necessary, or I must withdraw;

and, of course, the substance of Mr. Wagner's letters were,

Well, what's the emergency? Why do you need $2,000?

And the cable of 8 August is:

August 3 letter received and noted. *Imperative for many important reasons you send $2,000 at once.* You will fully agree when I see you.

Then he gets another letter, and then his telegram later in August, he says,

Letter of August 8 received and noted. You do not seem to understand English language. No more arguments or excuses, or *you may lose five years of work and gain a life of exile.* Do exactly, repeat exactly, as stated or forget it, and *I will then later be at liberty to write you full details on why your house of cards fell.*

It is impossible for me to understand why Mr. Bridwell, if he could send three telegrams over a period of a couple of weeks, why he couldn't have written a

letter and explained what was so urgent and why he needed $2,000, rather than acquire the money in the manner in which he acquired it. I think that is the really material evidence substantially with respect to that particular item.

MR. ADAMS: May I inquire whether or not on the date of the cables or the first one of August 3, 1961, the client had been advised of the settlements made some months earlier?

MR. BERTOCH: There is nothing in the evidence that I know of that he had been advised of any settlements, and *yet it was testified by Mr. Bridwell that settlements had been made several months prior* to the September visit to Switzerland.

If the rule of review set forth at the beginning hereof is applied to the record brought before us, and as illustrated by the parts included herein, I cannot see any basis upon which to justify a conclusion that the Commission acted capriciously, arbitrarily or unreasonably in the findings it made. On the contrary, I am convinced that they have performed their somewhat unpleasant duty in a conscientious and judicious manner, making findings adverse to Mr. Bridwell only when the evidence clearly so indicated. The alternatives confronted are whether to agree to the recommended order of outright disbarment, or to the conclusion arrived at by the majority of this court that the disbarment should be limited to a period of one year. In that connection it is to be observed that an order of outright disbarment is not necessarily a permanent thing. An attorney, though disbarred, by following the required procedure as to making proof of his qualifications, and as to his good moral character, may become reinstated in his profession. Upon the basis of what I have hereinabove set forth I think the findings and recommendation of the Bar Commission are justified and I would follow their recommendation. (All emphasis added.)

CALLISTER, J., concurs in the dissenting opinion of CROCKETT, C. J.

ELLETT, Justice (Explanation of the Per Curiam opinion):

While I am in agreement with the per curiam opinion, I think it only proper in view of the dissenting opinion to give some additional facts about this case. Ordinarily I would not think the public would be interested in the reasons for disciplining an attorney. It is a matter between court and counsel. However, I think the dissent did not fairly state the matter, so I give the following:

George Bridwell, an attorney who has practiced law before the courts of this State for over twenty years, appeals from findings, conclusions, and a recommendation of disbarment made by the Board of

Commissioners of the Utah State Bar, hereinafter called Bar.

Prior to 1957 Mr. Bridwell had represented a man by the name of Wagner in a divorce hearing; and because the service had been satisfactory to him in that matter, Mr. Wagner in 1957 engaged the services of Mr. Bridwell to represent him in an income tax matter involving him, his ex-wife, and Precisa, Inc., a corporation of which he was president and a minority stockholder. The majority of the stock was held by Precisa A. G., a Swiss corporation and its president.

The bookkeeping procedures between Wagner, Precisa, Inc., and Precisa A. G. were such as to attract the attention of the Internal Revenue Service, hereinafter referred to as I.R.S., and assessments were levied against Precisa, Inc., in the amount of some $90,000 and against Wagner and his ex-wife for $94,015.12. Wagner went to Switzerland, where he was born, and took with him $28,000 in moneys belonging to Precisa, Inc., thus further exciting I.R.S. and strengthening its belief that Precisa, Inc., was the alter ego of Wagner. From Switzerland, Wagner wrote Bridwell requesting representation and enclosing a letter to be given to a Mr. Grothe, who in the absence of Wagner was in charge of Precisa, Inc. In that letter Wagner gave instructions to Grothe for him to show some substituted entries in the books of account and to tell the I.R.S. that the entries had

been found in the local office. The letter further indicated dishonesty on Wagner's part in connection with the tax matters then being investigated.

In agreeing to represent Wagner and Precisa, Inc., Bridwell said that his fee would be $14,000 for handling the matter through the administrative process of the I.R.S., and in addition he demanded "carte-blanche authority and ample expenses so that I may hire accountants of my own choosing to work with me."

Since there was a probability that a tax fraud case would be filed against Wagner, Bridwell thought it wise to hire the accountants himself so as to clothe them with a certain amount of privilege in case they might be called as witnesses in a court proceeding. Pursuant to the authority given him, Bridwell did hire a certified public accountant and paid him $8,-967.50 for services rendered.

After Mr. Wagner went to Switzerland, the I.R.S. added another year to its claim of improper tax returns and raised the amount of the assessment to approximately three quarters of a million dollars.

In his efforts to convince the I.R.S. that Precisa, Inc., was not the alter ego of Wagner, Mr. Bridwell deemed it wise for him and the accountant to go to Switzerland and examine the books of Precisa A. G. They spent aproximately three weeks in time and $4,000 in expenses on this trip;

and while they did not give an itemized accounting to Wagner or Precisa, Inc., they did satisfy the I.R.S. that the $4,000 was legitimately expended, and it was allowed in the settlement of the tax claims when finally consummated.

Bridwell told Wagner and Precisa A. G. that there would be substantial fees over and above the $14,000, and they understood that there would be such. The total fees and expenses taken by Mr. Bridwell were $30,653.36, which to us seems reasonable, and the Bar does not claim to the contrary. However, since Bridwell under his carte-blanche authority took over the bank account of Precisa, there is a complaint made about his not getting authority before taking the money. Certain it is that he was guilty of a lack of adequate communication with Mr. Wagner, who remained in Switzerland during the four years the matters were being handled. Perhaps Bridwell did not have the knack of making for good public relationship with his clients; but since he was able to compromise the tax assessment at 7¢ on the dollar and to prevent the filing of a criminal complaint against his client for fraudulent filing of returns, no one can doubt that in the totality of events he performed an excellent service for his clients.

Apparently he had to be cautious in what he wrote lest, if the truth regarding his clients were known, the settlement might not have been possible and perhaps even a criminal charge placed against Mr. Wagner.

Wagner first complained to the Bar in 1963. However, a formal complaint was not made in this matter until April 15, 1966. The final hearing was held in October, 1968. In his complaint to the Bar, Wagner also made a number of allegations regarding the handling of relatively small sums of money during the four years which were required to finally determine these matters, i. e., between 1957 and 1961.

Mr. Bridwell complains bitterly about the delay and asserts that the statute of limitations should afford him protection against false claims which are so old that he cannot adequately present a defense thereto.

Absent a statute or rule on the matter, we do not think the statute of limitations applies to a disciplinary proceeding against a member of the Bar[1] for the reason that the courts are ever ready to see to it that lawyers who have such a close relationship to their clients must be like Caesar's wife —above reproach. However, even where there is no statute or rule to cover the matter, I think disciplinary proceedings initiated a long time after the alleged commission of the act complained of should be regarded with disfavor and due allow-

1. 7 Am.Jur.2d Attorneys at Law § 62.

ances made for the lack of opportunity on the part of the accused attorney to present a proper defense under the circumstances.

With this in mind I would answer specifically some of the statements made in the dissent.

As to "a," Bridwell feared the government might be opening and reading the mail to and from Wagner, and so he, wisely or not, deemed it important to communicate with his client personally, and may have become a bit impatient at the continued insistence of Wagner as to why he should send $2,000 for expense money. If Bridwell had to write the reasons, he might as well have written the whole story. It was just as necessary to prevent the government from finding out what the situation was in the one case as it would be in the other.

As to "b," these small items were received many years prior to the time when Bridwell was required to explain what he did with the money. He was simply unable to recall them; and as to the $4,000 item of expenses to Switzerland for him and the accountant, it is enough to say that that item is explained above.

As to "c," the record does not sustain the accusation made. The fact is that a man wanted to bid on the chandelier for his company but needed to contact his superior before doing so. It was he who requested the government auctioneer to postpone the sale of this item. Mr. Bridwell consented to the postponement, and the postponement was publicly announced. The prospective bidder was not authorized by his employer to bid, and when the matter was put for sale, there was only $145 bid for it. Mr. Bridwell paid five dollars more, and the sale was made to him. His client got the money, and Bridwell gave the chandelier to a friend. It well may be as a matter of law that when Bridwell bought this, he did so for his client and title would remain in his client. However, the client ought not get the money and fuss about the chandelier too.

As to "e," I agree that Bridwell's conduct was such as to merit some disciplinary action.

While Bridwell had powers of attorney in voting the stock so as to control Precisa, Inc., the business ceased operations due to failure of the European concerns to supply merchandise. This was no fault of Bridwell. There was no money collected, and payments on the building became delinquent.

Under the jeopardy assessments, the personal property of Wagner and Precisa had been sold at auction by the I.R.S., and Bridwell thought that an auction sale of the building was imminent. He permitted the owner to forfeit the contract of purchase and then arranged to have the owner give

Precisa, Inc., an option to repurchase at a price which would include an increase in the interest rate, $1,000 as attorney fees (which were only $750), and the amount of delinquent taxes together with a profit of $2,000 and a penalty of $1,091.15. Bridwell feared the arrangement might be considered by I.R.S. as a subterfuge, and so he permitted a Mr. Schubach, another client and also a close personal friend of his, to exercise the option and to get possession of the building. This satisfied the I.R.S. that the transaction was bona fide, and a settlement of all claims was then had.

Mr. Bridwell informed Mr. Wagner that he could have the building back if he would reimburse Mr. Schubach for his expenditure, which amounted to $11,370.30. This was not immediately done and a short time later Wagner found out that such was no longer the case.

Bridwell wrote Wagner that the building was now fully owned by Schubach and was worth $50,000 but could be bought for $45,000, and he recommended that Wagner buy it. Later he wrote Wagner that it could be bought for $42,000, and he recommended that Wagner borrow the money to buy it before it was sold to somebody else.

Wagner returned to the United States and dealt directly with Schubach. He purchased the building for $35,000, and in doing so had to give Schubach a profit of approximately $10,000.

The evidence does not warrant a finding that Bridwell got any of this money, and the Bar has not found that he did.

It should also be noted that Wagner spent a very nominal amount of his own money on this matter. Most of the fees and expenses were borne by the two corporations, and the officers of those concerns after meeting with Mr. Bridwell gave a statement completely exonerating him and ratified all that he had done in the matter. These officers were men who ran a worldwide organization and were knowledgeable in tax matters and other business ventures. One of them was a Swiss lawyer, and in addition thereto they retained a Swiss ex-judge to sit in on the meeting and to advise with them before they gave the statement.

It is my opinion that the order of the court as made is sufficient and should not be made more severe.

HENRIOD, J., took no part in this case, and NORSETH, District Judge, sat in his place.