493 P.2d 1273

**In re George H. BADGER, Disciplinary Proceeding.**

**No. 12052.**

Supreme Court of Utah.

Feb. 15, 1972.

Ronald C. Barker, Wilford W. Kirton, Jr., Robert B. Hansen, William G. Gibb, Salt Lake City, for appellant.

H. Wayne Wadsworth, Frank J. Gustin, Salt Lake City, Utah State Bar Ass'n., for respondent.

CALLISTER, Chief Justice:

The Disciplinary Committee of the Utah State Bar recommended that Mr. Badger be disbarred. The Board of Commissioners adopted this recommendation. This court has previously stated that it would look upon the findings and recommendation of the Bar Commission with indulgence and would not disregard its action unless there was something to persuade this court that the Commission had acted capriciously, ar-

bitrarily, or beyond the scope of its powers or was plainly in error.[1]

The Disciplinary Committee predicated their recommendation of disbarment on the grounds set forth in the findings and conclusions in the Third and Sixth Counts of the Complaint filed against Mr. Badger. These findings and conclusions were as follows:

*Third Count:* Findings of Fact

1. That between September, 1967, and December, 1967, Mr. Badger was involved as an attorney for an unincorporated business known as Federal Check Clearing House, owned by Ardco, a corporation, and J. M. Harrison; that while such attorney and as Sales Manager of Federal Check Clearing House, he solicited various merchants for, and on behalf of Federal Check Clearing House, and offered them the services of Federal Check Clearing House to collect such dishonored checks that the merchants might receive, and in such representations he indicated that he was an attorney and that if the checks couldn't be collected without a law suit, that he could take the makers of such dishonored check to Court beause [sic] he was a lawyer and that the checks would be collected without any expense to the merchant.

2. That at least one merchant, Albertson's, Inc., upon the representation of Mr. Badger, did enter into an agreement through Mr. Badger to have Federal Check Clearing House collect dishonored checks for them.

3. That Mr. Badger advised and assisted J. M. Harrison in drafting the documents contained in Exhibits 13 and 14, and also in setting up the method of operation of Federal Check Clearing House, and that such documents and the method of the operation of Federal Check Clearing House were designed by Mr. Badger to convey to the lay public that Federal Check Clearing House was a branch of the Federal Government and operated with all the authority and power of the Federal Government behind it, and that dishonored checks were automatically referred to it for processing. That Mr. Badger was actively engaged in the operation of the Federal Check Clearing House business during its inception and for several months after it began collecting dishonored checks for various merchants. That the documents in Exhibits 13 and 14 represented to debtors that their dishonored checks were being processed by computers and that such debtors would automatically be liable for not only the amount of the check but also for certain processing charges, attorneys' fees and for punitive damages.

4. That in October and November, 1969, letters were sent out to various debtors by

---

1. In Re Fullmer, 17 Utah 2d 121, 122, 405 P.2d 343 (1965); In Re Bridwell, 25 Utah 2d 1, 474 P.2d 116 (1970).

Federal Check Clearing House upon letterheads of Mr. Badger and over his stamped signature, which letters, among other things, recited that he represented Federal Check Clearing House and made demand upon the debtor for immediate payment of the check plus $7.00 attorneys' fees and costs, and recited that if this amount was not paid by a certain date, that Summons would automatically be issued and that the debtor would be required to pay additional Court costs and punitive damages, and said letter also referred to the UUtah [sic] Penal Code, and indicated that issuance of a dishonored check was a criminal offense.

5. That Mr. Badger, as an attorney, also assisted in the preparation of the Summons form which was utilized in Court actions wherein Federal Check Clearing House was plaintiff in matters involving dishonored checks.

6. That Ardco was part owner of Federal Check Clearing House, and Mr. Badger was Sales Manager of Ardco and had an option to purchase Ardco stock; that Ardco paid Mr. Badger commission and salary for his services, and Mr. Badger was financially interested in the success and profitability of Federal Check Clearing House.

CONCLUSIONS OF LAW:

That Mr. Badger, by such acts, violated rules of ethics of the U Utah [sic] State Bar as follows:

1. Rule No. 9

2. Rule No. 28

3. Rule No. 29

4. Rule No. 32.

That Mr. Badger, by such acts, was in violation of the following sections of the Utah Code:

1. 78-51-27(2)—That Mr. Badger, in the name of Federal Check Clearing House, promised to merchants a valuable consideraation, to-wit: that the merchant would not be required to pay any expense of collection, including attorneys' fees, as an inducement for the merchant to place dishonored checks received by the merchant in the hands of Federal Check Clearing House for collection and for Court action if necessary.

2. 78-51-31—That Mr. Badger was deceitful in the letter that he had prepared for sending to various debtors by Federal Check Clearing House in that such letter gave the impression that Federal Check Clearing House was an entity of the Federal Government and also that such debtors would be legally liable for attorneys' fees, collection charges, and punitive damages.

3. 76-19-6—Mr. Badger prepared, or assisted in the preparation of the letter dated October 27, 1967, as part of Exhibit 13, and letter dated November 28, 1967, as part of Exhibit 14, which letter was adapted to imply to the persons to whom these letters were sent a threat to accuse such person of a crime, and that such threat was made for the purpose of Federal Check Clearing

House receiving payment of not only the amount of the dishonored check, but, in addition, attorneys' fees and certain collection charges.

*Sixth Count:* Findings of Fact.

1. That on or about February 24, 1964, in an action entitled Richard Bigler, Plaintiff vs. George Badger and LaJuana I. Badger, his wife, defendants, Dale Howell and Nora Cox Howell, his wife, defendants and intervenors, Third Judicial District Court for Salt Lake County, Civil No. 134741, it was found by the trial judge in the Findings of Fact and Conclusions of Law that Mr. Badger was guilty of practicing common law fraud upon the Howells and judgment was entered in favor of the Howells and against Mr. Badger in the sum of $20,000.00 plus interest and attorney's fees of $2,500.00.

2. That on September 2, 1969 and after the Complaint against Mr. Badger was filed with the Board of Commissioners of the Utah State Bar, and the hearings thereon had been commenced before the Disciplinary Committee, Mr. Badger through his attorney made an effort ex parte to have the Findings of Fact and Conclusions of Law in said case No. 134741 modified; and on said date, upon motion of Mr. Badger, Stewart M. Hansen, Trail [sic] Judge in the original case, executed an order dated September 2, 1969 which purported to modify or correct the original Findings of Fact and Conclusions of Law and Judgment in said case.

3. That the Complaint covering the actions of Mr. Badger in the Howell transaction was made to the Utah State Bar Association by Dale Howell by letter dated July 22, 1965.

## CONCLUSIONS.

That the adjudication by the trial judge in case No. 134741 that Mr. Badger committed fraud upon the Howells was such evidence of conduct indicative of bad moral character as to justify disciplinary action by the Utah State Bar; that the action taken by Mr. Badger to correct or modify the Findings of fraud theretofore made by the trial judge in said case No. 134741 was doen irregularly, was ineffectual and did not legally change the original Findings.

A survey of the record before us reveals no basis upon which to conclude that the Commission acted capriciously, arbitrarily, or unreasonably in the findings. In fact, they found adversely to Mr. Badger only in those instances where the evidence clearly so indicated.

Mr. Badger urges that disbarment is too harsh a discipline for the circumstances of this case. A similar argument that suspension would be sufficient punishment was advanced in In Re Platz.[2] This

2. 42 Utah 439, 132 P. 390 (1913).

court responded that such a contention ignores the real purpose of disbarment proceedings. Where the specifications in such proceedings charge the attorney with acts and conduct which are clearly to the effect that he does not possess the attributes that entitle him to continue to practice his profession, the purpose of disbarring him is not to punish him but to protect the public.

■ The Bar Commission has recommended that Mr. Badger's conduct justifies disbarment; such a recommendation, in the final analysis constitutes a value judgment, which may be accepted, modified, or rejected by this court. However, this court has established a standard that it will sustain the recommendation of the Bar Commission unless it has acted arbitrarily, capriciously, or unreasonably. If the alleged severity of the recommendation be evaluated by this standard, there is no ground upon which this court can predicate a departure from it.

It is therefore ordered and adjudged that George H. Badger be disbarred from practicing law in the courts of this state effective upon issuance of the remittitur.

TUCKETT and CROCKETT, JJ., concur.

HENRIOD, J., does not participate herein.

ELLETT, Justice (dissenting).

The Heavy Hand of Disaster has this day been laid upon the professional career of George H. Badger, and this for naught which he has ever done in derogation of the rights of any of his clients. It seems to me that he is being disbarred because of an overabundance of zeal in his efforts to thwart forgers and bad check writers who prey upon the merchants of this city. I desire to state the facts of this matter as I think they are:

In disciplinary proceedings against George H. Badger, a member of the Utah State Bar, the Board of Commissioners of the State Bar, hereinafter referred to as Bar, recommends his disbarment.

Mr. Badger was admitted to practice law in the courts of this state on November 7, 1960, and began actual practice before the courts approximately one year later. At about the time he began his law practice, he bought a home and gave as part payment therefor some promissory notes signed by a debtor of his. The notes were not paid when they fell due, and thereafter the vendor sued and in February, 1964, got judgment against Mr. Badger, which judgment was subsequently paid in full. As a result, no one lost a dime because of what Badger did in a transaction as an individual dealing at arm's length with one whom he never at any time had any dealings in a professional way.

The Bar recommended disbarment because the court made a finding that Mr. Badger committed fraud against the vendor of the house.[1]

On or about the 30th day of August, 1969 (after the Bar initiated these disciplinary proceedings), the parties to the judgment entered into a stipulation that the trial judge might correct his findings if in fact he desired to do so. An affidavit was filed by the vendor and his wife asserting that the notes were received by them after the contract of sale had been made and that there was no consideration whatsoever given for the notes at the time they received them.

Upon motion and pursuant to the stipulation of the parties, the court on September 2, 1969, made the following order:

ORDERED, that all reference in the Findings of Fact, Conclusions of Law or Judgment entered in the above entitled matter to fraud by the Defendants George Badger and LaJuana I. Badger be and the same hereby are struck and deleted therefrom, and that no fraud exists or is found in this matter, it appearing to the Court that prior to the delivery of said notes to Howells by Badger the Badgers owed an unsecured indebtedness to Howells and that Howells did not part with anything of value or change their position in reliance upon or in exchange for said notes, and that when said notes proved to be valueless that Howells were still the holders of an unsecured claim against Badgers.

While it may be true that the court could not at the time change its findings and that in another court proceeding Mr. Badger would be faced with the collateral estoppel doctrine,[2] still when it comes to the question of whether or not to disbar an attorney, neither the Bar nor this court should close eyes and ears to the truth of a matter and assume an adamant position based upon a finding which was erroneously made.

Oral complaint in this matter was first made to the Bar in the early part of 1961 or 1962. The complaint was filed and citation issued wherein Mr. Badger was notified to defend the matter on September 17, 1968.

The matter of In re Bridwell[3] was decided August 31, 1970. In the Explanation to the Per Curiam Opinion it was said:

. . . However, even where there is no statute or rule to cover the matter, I think disciplinary proceedings initiated a long time after the alleged commission of the act complained of should be regarded with disfavor and due allowances made for the lack of opportunity on the part of

1. A finding of fraud would prevent a discharge of the judgment in a bankruptcy proceeding.

2. Richards v. Hodson, 26 Utah 2d 113, 485 P.2d 1044 (1971).

3. 25 Utah 2d 1, 474 P.2d 116.

the accused attorney to present a proper defense under the circumstances.

Two days after the Bridwell decision was released, to wit, on September 2, 1970, this court approved rules of disciplinary procedure as recommended by the Utah State Bar and particularly Rule V. 3, which provides:

No improper conduct by a member of the Bar shall be a basis for disciplinary action against such member, unless such disciplinary action is initiated against such member in the manner by these rules provided within three years from the discovery by the aggrieved party of the facts upon which such action is based.

The Bar further charges Mr. Badger with solicitation. The facts as found were disputed, and while it seems to me that the proof preponderates in Mr. Badger's favor, nevertheless, I cannot say from reading the cold record that the Bar was not justified in making its finding.

It seems that Mr. Badger was closing out his law practice in 1967 as he held the position of sales manager for Ardco Corporation, which dealt in outdoor recreational equipment, and was calling on supermarkets in connection with his duties as sales manager. He learned that one large concern was losing approximately $50,000 per year because of cashing bad checks for customers, and he began thinking of ways and means of preventing such losses. He rea-

soned that some form of computer service might quickly detect fraudulent check writers and make the information regarding such check writers instantly available to all merchants who cared to subscribe to the service. Thus a writer of bad checks would be detected before he could pass any great number of checks in the community. Mr. Badger knew nothing of computers. However, he knew the sales manager of Bank Americard, who was interested in the idea, and together they called upon Jack Harrison, who did the programming of a computer used by a check collecting organization known as Collect-A-Check. They wished to know if Harrison could implement his existing computer program to afford a rapid follow-up on bad check artists. Mr. Harrison did business as Jack Harrison and Associates, a partnership. He was interested in the idea presented to him, and his organization entered into an arrangement with Ardco and Collect-A-Check whereby they would form a computerized check collection agency. While Mr. Badger had no interest in the matter except as sales manager of Ardco, he entered into the discussion as to how the matter would be set up.

The name of the new collection agency was to be Federal Check Clearing House. Before finally deciding on the name, Mr. Badger called the United States District Attorney's office and was advised by a deputy district attorney that he knew of

no reason why the name chosen could not be used.[4]

The computer was programmed to write two letters to the maker of a bad check. The first one demanded payment of the check in full plus a computer fee of three dollars. The second one demanded an attorney's fee of seven dollars in addition to the amount of the check and also threatened suit if the same was not paid. It further advised the maker that if suit was commenced, he would be liable for punitive damages and attorney's fees.[5]

These letters from the computer went out over the stamped signature of Mr. Badger. Mr. Badger denied any knowledge of the fact that his stamped signature was being used in the computer and claimed that it was to be used only in connection with transfer of the titles to motorized equipment sold by Ardco. The Bar found to the contrary. However, it is to be noted that Mr. Badger had his signature removed after it had been used about one week. He claims it was just as soon as he knew about it. It is also to be noted that Mr. Badger never at any time brought any action on any of the checks which the collection agency processed.

The Bar found that Mr. Badger told the manager of a supermarket that he, Badger, was an attorney and could collect the check for free if suit needed to be brought. Mr. Badger denied making the statement, and the witness with Mr. Badger testified that she never heard him make any such statement. Mr. Badger was neither an employee of nor attorney for Federal Check Clearing House and was not authorized to make any such statement. Another lawyer was attorney for the entity for a few months but quit because there was a third lawyer who undertook to treat him as an employee.

Since the Bar has made a finding of solicitation on the part of Mr. Badger, I am not inclined to ignore the matter totally. However, since no actions were ever instituted by Mr. Badger against any of the bad check writers, I am not inclined to follow the Bar's recommendation that he be disbarred.

While we ordinarily accept the determination of the Bar as to what the facts

4. Later the Federal District Attorney advised that it would be unlawful to use the word "Federal" in the name, and as a result of that advice, the name was forthwith changed.

5. Federal Check Clearing House agreed to remit the full amount of the check to the defrauded merchant and hoped to make a profit on the extra amount collected by way of handling charges, punitive damages, and attorney's fees. It is obvious that Mr. Badger believed that punitive damages could be collected, since the City Court where the cases would be brought allowed punitive damages in actions on checks given to defraud a merchant.

are and give due consideration to any recommendation it may make as to the punishment to be imposed, we cannot abrogate to others the power which inheres in this court to make the final decision in matters involving the discipline of attorneys whom we authorize to practice before the courts of this state.[6] The Legislature recognized our right and duty in this regard when it enacted Section 78–51–19, U.C.A.1953, which reads:

Upon the making of any order by the board recommending the discipline, suspension or disbarment of any member of the Utah state bar from the practice of law, the board shall cause a certified copy thereof to be filed with the clerk of the Supreme Court. The Supreme Court may review the action of the board, and may on its own motion and without the certification of any record inquire into the merits of the case, and take any action agreeable to its judgment. *Nothing in this title contained shall be construed as limiting or altering the powers of the courts to disbar or discipline members of the bar.* [Emphasis added.]

I believe that suspension from the practice of law before the courts of this state for a period of one year would be ample discipline in this matter, and would so order.

---

6.  In re Macfarlane, 10 Utah 2d 217, 350 P.2d 631.