**In re Robert B. HANSEN, Disciplinary Proceeding.**

**No. 15605.**

Supreme Court of Utah.

Aug. 11, 1978.

LaVar E. Stark, Frances M. Wikstrom, Brian Florence, Ogden, Pamela Greenwood, Salt Lake City, for Utah State Bar.

Edward W. Clyde, William G. Gibbs, J. Thomas Greene, Jr., Salt Lake City, for Robert B. Hansen.

CROCKETT, Justice:

This is a disciplinary proceeding relating to allegations of unprofessional conduct by

Robert B. Hansen, Attorney General of the State of Utah. After due investigation and the holding of hearings by its disciplinary committee, the Utah State Bar Commission adopted the findings and recommended to this Court that the respondent attorney be suspended from the practice of law for one year.

The findings of the Bar as to conduct which did not meet the required professional standards are two types: one related to delays and delinquencies in collecting and remitting money to his clients; the other related to activities in connection with the prosecution of *Salt Lake City v. Piepenburg* wherein the charge was showing a pornographic movie.[1]

It appears that prior to being elected as Attorney General, the respondent was involved in the operation of a collection agency which handled a large number of accounts. One finding is that with respect to one of these accounts he failed to maintain adequate records of the funds collected, permitted the money collected to be commingled with his own funds, did not render prompt and sufficient accounting to his clients and make prompt remittance of funds, failed to reasonably cooperate and communicate with his clients or with their subsequently engaged counsel, and that remittance to his client was not made until collateral pressures were applied to respondent.

Another matter of similar character related to the handling of a divorce and the collection of child support, in which comparable findings were made.

The charge of misconduct in connection with the case of *Salt Lake City v. Piepenburg* is of a different character. It is that, as Deputy Attorney General, he associated himself as counsel for the prosecution and in connection therewith caused an investigation to be made of prospective jurors, which included the interviewing of their neighbors, friends and church officials. Concerning this the Bar found that there was no violation of the Rules of Profession-

al Conduct. However, with respect to another aspect of that same case, the complaint is that the respondent, in an interview with a television reporter, made statements concerning the strength of the prosecution's case and the likelihood of its outcome. The statements were reported on public television, all of which was found to be a violation of Rule IV, Canon 7, DR 7–107(B)(6).

In preface to considering the findings just recited and what should be done about them, there are certain foundational principles to be had in mind. It is not to be questioned that the licensing of an attorney permits him to hold himself out to the public as one learned and skilled in handling legal problems and procedures, that he will become identified with and take care of his clients interests with reasonable diligence and a high degree of fidelity. Neither is it to be questioned that in this instance there has been failure to some extent to measure up to that high standard. Accepting the foregoing as a premise, the question of critical concern is as to what is the just and appropriate corrective penalty or sanction to be imposed. In assuming the responsibility of this Court to make that determination, we think it is both wise and desirable to consider all relevant factors.

Speaking in generality, it is to be realized that the attainment of a profession usually represents, in addition to the years of education devoted to that purpose, the commitment of a lifetime to a man's career and that therefore, the deprivation of that privilege is something which should not be done lightly, nor at all unless the attorney is guilty of some culpable wrong or there is some other serious matter to justify that kind of surgery on his means of livelihood. This has special application in the instant case because Mr. Hansen has been elected by the people of this state as its Attorney General and thus has various important responsibilities to fulfill in which he would be hampered, at least to some extent, by his suspension from practice. This is said without intending any disparagement of the

---

1. Utah, 571 P.2d 1299 (1977).

principle that the holding of public office should not exempt one from being held accountable for any misdoings, nor from just and proper penalties therefor. On the other hand, in matters such as we are concerned with here, which occurred before respondent's election as Attorney General, and do not pertain to his public duties, he should not be held more accountable nor dealt with more harshly than others would be.

Without condoning the respondent's conduct as found by the Bar, it is appropriate for us to note that his evidence disputes those findings; and also to set forth his explanation in excuse of such failures as occurred. He avers that they were due in part to the necessity of entrusting to others some of his responsibilities incident to his transition from private practice into the political field. Other matters stated in amelioration include the facts that, although it is true that the complainants were put to considerable delay and inconvenience in respect to their business, their money was in fact collected and finally remitted to them. Also to be considered in the composite of this situation is the fact that, due in part to his being a public official, the respondent has been put to a great amount of time, effort and expense and subjected to a great amount of adverse publicity and criticism in relation to these proceedings.

Finally, and most important, is the fact that the Commission made no finding imputing to the respondent any dishonesty, or any willful or intentional wrongdoing. In stating that it had taken into account the claims of mitigation, the Commission properly characterized its position in its own brief in its statements that: ". . . *if* fraudulent or evil intent had been present . . ." and further that, "*if* any of the violations had been found to be the result of willful and deliberate misconduct . .",

the attorney should have received a more severe penalty.

We have reviewed the foregoing matter in awareness of our previous declarations of this Court that, though it is the prerogative and responsibility of the court to make the findings and orders in such matters,[2] we will nevertheless regard the findings and recommendation of the Commission as advisory, and will accord them some degree of indulgence, and be inclined to act in accordance therewith unless it appears that the Commission has acted arbitrarily or unreasonably.[3]

■ In recognition thereof, upon our consideration of all of the factors involved in this situation, particularly the fact that there is no finding of any dishonesty or willful misdoing, but the derelictions complained of appear to be matters of neglect and indiscretion, it is our opinion that the ends of justice and the purposes of this proceeding will best be served by our declaration that the improprieties wherein respondent failed to conform to the high standard of diligence and fidelity which should be measured up to by members of the Bar render him subject to censure and a reprimand. Further, he is ordered to reimburse the Utah State Bar for the actual and necessary expenses incurred by it in connection with this disciplinary proceeding.

No court costs are awarded.

WILKINS, Justice (concurring with holding).

I concur with the holding of the majority opinion but add these comments.

This Court since 1960, as noted infra, has at times emphasized as a standard of review concerning the Bar's findings and recommendations that they should be adopted unless they are arbitrary, capricious, unreasonable, or not supported by substantial

---

2. *In re Fullmer*, 17 Utah 2d 121, 405 P.2d 343 (1965); *In re Bridwell*, 25 Utah 2d 1, 474 P.2d 116 (1970); *State ex rel. Schwab v. State Bar Association*, 80 Wash.2d 266, 493 P.2d 1237 (1972).

3. *In re Fullmer*, supra note 2.

evidence (or other similar language).[1] At other times, however, this Court has emphasized that the recommendations made by the Bar are not ". . . to be in the same category . . ." as findings of fact ". . . because it is our responsibility to discipline an erring attorney, and we cannot delegate that duty to others . . .".[2]

Even where this Court announced the standard of review as requiring adoption of the Bar's recommendations unless they were arbitrary, capricious, or unreasonable (or similar words), it acknowledged that a review of Bar proceedings ". . . is not like an ordinary appeal or administrative review because the order to be made is the responsibility of this court . . .".[3] I respectfully suggest that this duality of standards (appearing both within a single case and in cases compared one with the other) creates uncertainties and contradictions which now require reanalysis.

I believe for clarity and guidance, this Court should state unequivocally that the recommendations by the Bar are *advisory* only as ". . . we cannot delegate that duty [of disciplining attorneys] to others . . .".[4]

As noted in the majority and minority opinions, the Bar Commission—by findings—determined, and properly so, that Mr. Hansen was in violation of the disciplinary rules of the Bar. The recommendation of a one year suspension, however, in my opinion, is too severe. The judgment of public censure herein stated is sufficient—there is proportionality between the violations and the sanction imposed by this Court—because dishonesty and flagrant misconduct are not involved here. Violations, serious ones, yes—but not transgressions which compel a sanction of depriving Mr. Hansen of his license to practice law. And I make these observations independently of Mr. Hansen's status as Attorney General of this State, which I believe, as does Mr. Justice Maughan in his dissenting opinion, is not properly before us and is therefore irrelevant to our determination.

One concluding thought. Do these comments and this holding suggest or impel a relaxation of the code of professional responsibility. I think not. I rather prefer to believe that this Court's judgment constitutes a frontal and unobscure declaration of rebuke—unaccompanied, however, by the punishment of suspension which *could* be imposed.

Restraint here by this Court is not a flouting of our honored code. It is just that when the measure of punishment is considered, the majority of this Court and members of the Bar Commission view the matter differently. I, of course, respect the views of the Commissioners, not suggesting for a moment a deficiency in them of ability or sensitivity, but I do not here share those views concerning sanction, which, as noted ante, is the responsibility of the Utah Supreme Court.

HALL, J., concurs in the views expressed in the concurring with holding opinion of WILKINS, J.

MAUGHAN, Justice (dissenting).

For the following reasons, I dissent. The evidence adduced and precedential case law, in my view, require affirmance of the recommendation of the Board of Commissioners.

---

1. See *In re Macfarlane*, 10 Utah 2d 217, 350 P.2d 631, 633 (1960); *In re Fullmer*, 17 Utah 2d 121, 405 P.2d 343, 344 (1965); *In re Badger [Badger I]*, 27 Utah 2d 174, 493 P.2d 1273, 1275 (1972); and *In re Johnston*, Utah, 524 P.2d 593, 594 (1974).

2. *In re Bridwell*, 25 Utah 2d 1, 474 P.2d 116 (1970). Also see *In re Badger [Badger II]*, 28 Utah 2d 240, 501 P.2d 106 (1972), where this Court without discussion, modified its prior order and judgment in *Badger I*, note 1 supra, by reducing the punishment recommended by the Bar in *Badger I*. Additionally, see *In re Hughes*, Utah, 534 P.2d 892 (1975), where the Court stated it was ". . . not bound to the recommendation of the Bar Commission . . .", though it upheld that recommendation to the extent noted therein.

3. *In re Fullmer*, note 1 supra, at 405 P.2d 344.

4. *In re Bridwell*, note 2, supra, 474 P.2d 116.

The matter was heard by three honorable and learned men, Carman E. Kipp, Esq., Chairman, David W. Sorenson, Esq., and the Honorable Calvin Gould, a judge of the district court. All are members of the Board of Commissioners. The assessment of the evidence as reflected in the findings of fact by these examiners merits serious consideration. The recommendation of the examiners, which was approved and adopted by the Board of Commissioners, should be evaluated in the light of the years of professional experience of these men. There is no reason to suppose these men are any less sensitive than this Court to the effect of a disciplinary proceeding. On the other hand, to attenuate the code of professional responsibility as an empathetic response to the plight of a fellow lawyer neither advances the honor of the legal profession nor inspires public confidence. If this be a government of laws, the lawyer is the keystone, and the system will crumble, if there be not strict adherence to the professional code of conduct. Without proper sanctions, recommended by thoughtful, experienced men, the code is rendered a public relations device. The autonomy of an old and honorable profession is now jeopardized by rationalization diminishing three serious acts of misconduct, in order to nullify the recommended sanction of the bar.

In evaluating the one year suspension recommended by the Board of Commissioners, it is essential to review the findings.

In Count I, the Board found:

(a) That Hansen undertook to perform legal services on behalf of J. E. Lowry and Evelyn Lowry in the course of which activity he collected funds for them;

(b) That Hansen failed to notify his clients of the receipt of those funds within a reasonable time;

(c) That Hansen failed to maintain complete and adequate records of the funds which he collected;

(d) That Hansen failed to render an appropriate or sufficient accounting to his clients;

(e) That Hansen failed to pay promptly said funds to his clients as they were received or when requested to do so by his clients;

(f) That the acts described above, violate the provisions of Rule IV, Canon 9, DR 9–102(B), (1), (3), and (4),[1] of the Rules of Professional Conduct of the Utah State Bar and the provisions of Section 78–51–42, U.C.A.1952.[2]

(g) That Hansen failed to maintain the funds collected in a separate trust account and commingled the same with his own funds;

(h) That the acts described in (g) violated the provisions of Rule IV, Canon 9, DR 9–102(A), of the Rules of Professional Conduct of the Utah State Bar;[3]

(i) That Hansen did not complete the legal services which he undertook for these clients in a timely manner, that he neglected the matter, and that he failed and refused reasonably and adequately to communicate with his clients or their subsequently engaged counsel;

(j) That the conduct described in (i) violated the provisions of Rule IV, Canon

---

1. "(B) A lawyer shall:

(1) Promptly notify a client of the receipt of funds, securities, or other properties.

\* \* \* \* \* \*

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

2. An attorney and counselor who receives money or property of his client in the course of his professional business and who refuses to pay or deliver the same to the person entitled thereto within a reasonable time after demand is guilty of misdemeanor.

3. "(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows: . . ."

6, DR 6–101(A), (3) [4] of the Rules of Professional Conduct of the Utah State Bar.

The evidence adduced supports the findings. It shows the following:

In 1963, J. E. Lowry employed Hansen to recover certain sums from Allen Gardner and Leslie Boothe. These two were agents of Franklin Life Insurance Company, and Mr. Lowry, as regional manager, was responsible for overdraws of his agents. Both Gardner and Boothe had drawn advances against unearned commissions. Their deficit was the responsibility of Mr. Lowry, and although the action was filed in the name of Franklin Life, the sums collected were paid to Mr. Lowry and after his death in 1964 to Mrs. Lowry.

Between 1965 and 1970, Mr. Hansen periodically collected amounts on the Boothe suit. In 1966, Hansen began remitting the sums directly to Mrs. Lowry. On twelve separate occasions between October 30, 1968 and May 14, 1970, Hansen received payments on the Boothe suit and made no remittance to anyone until after the complaint was filed with the Bar in 1976.

The evidence supports the finding that Hansen failed to maintain complete and adequate records of the funds he collected. After he had appeared before the screening committee, at its suggestion, Hansen attempted to prepare an accounting compiled from his receipt books. At the hearing, it was established Hansen had filed a garnishment proceeding on the Boothe suit and obtained $68.11 from First Security Bank. Hansen admitted he could find no record to show what happened to those funds.

The evidence indicated Mrs. Lowry wrote a letter, dated May 6, 1968, requesting an accounting. She received no response. She sent another by registered mail on March 4, 1971, with no response. During this time Mrs. Lowry sought the assistance of her son, who contacted Hansen to request the matter be turned over to another lawyer.

Hansen responded by a note on a check stub he sent to Mrs. Lowry, stating he would retain and finish the suit and have a progress report by April 15th. No report was furnished. A third letter was mailed February 10, 1972, together with Mrs. Lowry's own records of the checks she had received and requesting an accounting. One of these letters was found by Hansen, shortly before the hearing, unopened. Mr. Lowry's son testified he made several requests over the telephone to Hansen for an accounting. None was forthcoming.

In regard to the Gardner account, no money was received from him after 1964. Furthermore, Hansen made no efforts to collect on this account after that date. In 1975, Gardner died leaving no apparent estate. The finding of neglect is sustained by this eleven year old file, which indicated no collection efforts had been made despite repeated requests including an attempt by Lowry to have the file turned over to other counsel.

In Count II, the Board found:

(a) That Hansen undertook to perform legal services for one Winona Emarine in the collection of child support, and that he collected funds for this client;

(b) That Hansen failed to notify his client of the receipt of said funds;

(c) That Hansen failed to maintain complete and adequate records of the funds collected to his client;

(d) That Hansen failed to maintain complete and adequate records of the funds which he collected;

(e) That Hansen failed to pay the funds over to this client promptly as they were received, or when requested to do so by his client;

(f) That the foregoing conduct constituted violations of Rule IV, Canon 9, DR 9–102(B)(1), (3) [5] of the Rules of Professional Conduct of the Utah State Bar;

4. "(A) A lawyer shall not:
  \*   \*   \*   \*   \*   \*
  (3) Neglect a legal matter entrusted to him."

5. See note 1, supra.

(g) That the said acts did constitute a violation of the provisions of Section 78–51–42, U.C.A.1953;[6]

(h) That Hansen failed to maintain the funds collected in a separate trust account and commingled the same with his own funds;

(i) That the acts described violated the provisions of Rule IV, Canon 9, DR 9–102(A) of the Rules of Professional Conduct of the Utah State Bar.[7]

Again, the evidence supports the findings.

Hansen undertook to perform legal services for Winona Emarine in the collection of child support payments from her former husband, Berry Belcher. Belcher deposited the checks, which were generally in the sum of $65.00, with the Clerk of the Court. Hansen either picked up the checks or had the clerk mail them to him. Pursuant to a power of attorney granted to him, Hansen endorsed the checks and deposited them in his bank account.

From 1966 to July of 1969, Mrs. Emarine received payments for child support from Mr. Hansen. From July 1969 to December 1974, Mrs. Emarine neither heard nor received any child support payments from Hansen. In December 1974, Mrs. Emarine, who was residing in Hawaii, received a communication from Mr. Hansen including an affidavit. The affidavit was to assist in the collection of past-due child support; it recited the sums of money Mrs. Emarine had allegedly received for child support. Mrs. Emarine refused to sign and sent Hansen a letter stating that she had not received the money and inquiring where he had obtained the figures recited in the affidavit. Hansen responded the figures were obtained from the clerk of the court and that he would check his records to verify the amounts. The last correspondence from Hansen was dated March 3, 1975. Mrs. Emarine did write another letter but upon not receiving a reply decided to defer pursuing the matter until July 1975, at which time she returned to Salt Lake City, Utah.

Upon her return in July, she contacted Hansen, who informed her that he thought he owed her money but he'd have to check his records. Mrs. Emarine proceeded to contact him several other times; each time she was able to reach him, Hansen claimed he hadn't had time to check his records. He offered her $100 to indicate his good faith. This sum was subsequently sent her attorney. After checking the records of the clerk of the court, Mrs. Emarine employed an attorney to effect recovery of her money. This was done about August 1, 1975. Her attorney also received a check for $50.00.

Mrs. Emarine's attorney contacted Hansen and requested an accounting and the funds. This was done by letters dated August 2, August 21, and August 27, 1975. Hansen did not make an accounting and subsequently an action was filed against him.

Other than the aforementioned payments of $150.00, Hansen refused to pay any sums until Mrs. Emarine procured the cancelled checks from her former husband, and proved the checks, in fact, had been deposited in Hansen's bank account and had been cleared by the bank. Mrs. Emarine was able to procure these cancelled checks only in a piecemeal fashion from Mr. Belcher, and later his widow. Then and only then did Hansen disburse the funds, after deducting his attorney's fee.

Hansen paid $449.28 on September 4, 1975, after the production of some of Belcher's checks. Hansen deposited $1,285.00 with the clerk of the court on September 27, 1975, which was paid on January 10, 1977, after production of additional cancelled checks of Belcher. After the production of the remaining checks, Hansen paid $599.00 on February 23, 1977. A total of $2,483.28 in child support money.

In Count III, the Board found:

(a) That Hansen associated as counsel in the prosecution of a criminal case and participated in the trial of the case;

6. See note 2, supra.

7. See note 3, supra.

(b) That prior to commencement of the trial, Hansen communicated with a reporter for a Salt Lake City television station, at which time he told the reporter that investigations had been made regarding the prospective jurors and that based on the information obtained, Hansen was certain that the defendant would not be acquitted, and that at least two of the jurors would cause the jury to be hung if the jury did not find for conviction;

(c) That the substance of this interview was reported by the said television channel on its evening news;

(d) That Hansen's extra-judicial statement was such that a reasonable person would have expected it to be disseminated by the television station which was a means of public communication, and that its substance was such that it was reasonably likely to interfere with a fair trial;

(e) That the acts described violated the provisions of Rule IV, Cannon 7, DR 7–107(b), (6); [8]

(f) That the acts described violated the provisions of Rule IV, Canon 7, DR 7–107(D). [9]

After a careful survey of the record the findings of the Bar should be adopted by this court in accordance with its prior ruling that such be done, unless the findings appear to be arbitrary, or not in accord with the preponderance of the evidence. [10]

The disagreement centers on the appropriate sanction for the misconduct. It is undisputed that this court does not place a rubber stamp endorsement on the recommendation of the bar; for, in fact, the final responsibility to discipline an erring attorney is with this court. [11] Nevertheless, this court has devised a standard that it will sustain the recommendation of the Bar Commission unless it has acted arbitrarily, capriciously, or unreasonably. [12] In application of this standard it should be reiterated the purpose of a disciplinary proceeding is not to punish an attorney, but to admonish him and to protect the public against future transgressions on his part. The sanction to be imposed is determined by what, in justice and fairness to *all*, this court's judgment should be. [13]

The argument has been vigorously urged that the recommendation of the Bar Commission is unduly severe in that Hansen's misconduct was not found to be willful and deliberate. There should be an immediate clarification that there was no finding as to Hansen's intent or scienter. It is an act of dissembling to suggest any omission in the findings is tantamount to a positive and specific finding, in this regard.

The specific rules which Hansen was found to have violated are set forth in footnotes 1, 3, 4, 8, 9. A perusal of the express provisions of these rules clearly indicates an express intent is not requisite to constitute a violation. It matters not whether the duty was violated by inadvert-

8. "(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial, or disposition of without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be dissemenated by means of public communication and that relates to:

&ast; &ast; &ast; &ast; &ast; &ast;

(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case."

9. "(D) During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extra-judicial statement that a rea-

sonable person would expect to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case."

10. *In Re Bridwell*, 25 Utah 2d 1, 474 P.2d 116 (1970).

11. *In Re Macfarlane*, 10 Utah 2d 217, 350 P.2d 631 (1960); *In Re Bridwell*, note 10, supra.

12. *In Re Badger*, 27 Utah 2d 174, 493 P.2d 1273 (1972).

13. *In Re Hanson*, 48 Utah 163, 168–169, 158 P. 778 (1916).

ence, neglect, or incompetence on the part of the attorney; the duty is constant and the invasion of the interests of the client remains constant regardless of the motive or intent of the attorney. Indeed, there was an express finding in both Counts I and II that Hansen's acts constituted a violation of § 78–51–42.[14] This is, in fact, a criminal statute, and implicit therein is a requisite intent to commit the crime therein defined, viz., a refusal by an attorney to pay or deliver money or property of the client received by the attorney in the course of his professional business, within a reasonable time after demand by the person entitled thereto. A refusal under this statute cannot be deemed mere inadvertence or neglectful, but a deliberate and intentional decision to refuse.

Is the one year suspension recommended by the Bar Commission a fair and just judgment to both Hansen and the public? Although not determinative, a review of this court's action in other cases of similar misconduct is instructive.

In *In Re Hatch*,[15] the attorney collected money from his client for the purpose of paying it to a third party. The attorney retained the money for four years without either paying it to discharge his client's obligation or requesting instructions from his client for its disposition. This court held the one year suspension recommended by the Board of Commissioners was justified.

In *In Re Steffensen*,[16] the attorney refused to pay, after demand by his client, the sum of $38.99, which was the amount remaining after collection of a judgment and deduction of attorney's fees. The Board of Commissioners recommended a three month suspension due to extenuating circumstances attending the transaction. This court approved the recommendation.

In *In Re Larsen*,[17] the attorney failed to account for funds on a claim forwarded to him. This court sustained the recommended three month suspension. In *In Re Lund*,[18] the attorney commingled his client's funds with his own and failed to account to his client. This court ruled that the one year suspension recommended by the Bar Commission did not seem capricious or too onerous in light of the obvious indiscretion of the attorney. In *In Re Hughes*,[19] the attorney was found, under two separate complaints, to have commingled his clients funds with his personal funds. This court ruled that the one year suspension recommended by the Bar Commission was not unreasonable. In *In Re Wade*,[20] the attorney was found to have neglected to attend to his clients' affairs which were entrusted to his care, and that he failed to maintain complete records of his client's funds and did not account to the client therefor. This court approved as appropriate a suspension from practice for a period of two years as recommended by the Board of Commissioners. In *In Re Fullmer*,[21] the attorney was found under two counts to have converted money belonging to his clients. In regard to the attorney's attempt to explain the circumstances, this court responded that the attorney appeared to have been more concerned with his own situation than with the effect his conduct had upon others and his responsibilities as a lawyer to the Bar and to the public. Although the attorney urged the recommended suspension for three years was unduly severe, this court adopted the recommendation.[22]

In all the aforecited cases, this court adopted the recommended suspension made by the Board of Commissioners. When Hansen's acts of misconduct and the ensuing recommended sanction are compared to

14. See note 2, supra.

15. 108 Utah 446, 160 P.2d 961 (1945).

16. 85 Utah 380, 39 P.2d 722 (1935).

17. 11 Utah 2d 325, 358 P.2d 908 (1961).

18. 29 Utah 2d 181, 506 P.2d 1272 (1973).

19. Utah, 534 P.2d 892 (1975).

20. 27 Utah 2d 410, 497 P.2d 22 (1972).

21. 17 Utah 2d 121, 405 P.2d 343 (1965).

22. Also see *In Re Pearce*, Utah, 540 P.2d 515 (1975); *In Re Gudmundson*, Utah, 531 P.2d 489 (1975).

similar cases, there is no rational basis to deem the recommendation arbitrary, capricious, or unreasonable.

The injection into this matter of the status of Mr. Hansen, viz., that of Attorney General, comes from outside the record. Such is not part of the record made in the proceedings before the Commission. Consequently, such is not before us.