**In re Richard WORTHEN, Justice Court Judge.**

**William Gibbs, Complainant.**

**In re Gaylen BUCKLEY, Justice Court Judge.**

**Robert Newton, Complainant.**

**Nos. 950536, 950537.**

Supreme Court of Utah.

Oct. 22, 1996.

Stanley R. Smith, Lisabeth Joner, American Fork, for Judge Worthen.

Benson L. Hathaway, Salt Lake City, for Judge Buckley.

Steven H. Stewart, Salt Lake City, for the Commission.

ZIMMERMAN, Chief Justice:

These matters came before us on the motions of Justice Court Judges Richard Worthen and Gaylen Buckley. Both requested a hearing at which they could present additional evidence and argument prior to our issuance of any order implementing, modifying, or rejecting the orders of the Judicial Conduct Commission ("Commission"), entered under section 78–7–28 of the Utah Code, sanctioning each judge for willful misconduct in office and for conduct prejudicial to the administration of justice. The judges also requested that we close our hearings to the public. We granted their request for hearings but declined to close the hearings.[1] Having heard oral argument, we now remand these cases to the Commission for further proceedings.

A prefatory note is in order. These are the first cases to come before us where the

---

1. Our order in each case read:

No good cause having been shown as to why these proceedings should not be open to the public, THE COURT ORDERS THAT:

1) The hearing on implementation of the Judicial Conduct Commission's order in Re: [The Honorable Richard Worthen] [The Honorable Gaylen Buckley], Justice Court Judge shall be open;

2) All documents filed with the court by parties and proposed intervenors are hereby made public, pursuant to section 78–7–30(6)(b)(i).

Commission has entered an order imposing sanctions against Utah judges and the judges have challenged the Commission's action. As a result, these are the first cases where we have been called upon to construe the relevant constitutional and statutory provisions and to scrutinize the Commission's conduct of its business. Our conclusion that errors have been committed and that these cases should be remanded should not be construed as an indication that the Commission has in some manner fundamentally failed in the performance of its duties or that the conduct of these judges does not merit the Commission's attention. Rather, due to the relative newness of the Commission and the paucity of guidance provided it by the constitution, statutes, and case law, it is not surprising that we find the proceedings before us wanting in some respects. Today, we undertake to supply some of the guidance the Commission needs if it is to fulfill the essential tasks that it has been assigned.

We begin with a brief review of the Commission's history and function. From 1896 to 1971, there were only two methods for disciplining judges whose conduct violated ethical norms, removal from office and impeachment. "Removal from office" was authorized under article VIII, section 11 of the Utah Constitution (repealed 1984). Removal could be accomplished only by a concurrent vote of both houses of the legislature, with two-thirds of the members of each house concurring in the removal. Utah Const. art. VIII, § 11. The article provides that removal should be "for cause" but does not specify any particular causes. In contrast, article VI, section 19 provided (as it does today) for impeachment of judicial officers for high crimes, misdemeanors, or malfeasance in office. Impeachment could be initiated only by a vote of two-thirds of the members of the house of representatives, and trial was had to the senate, with conviction only upon the vote of two-thirds of the senators. Utah Const. art. VI, §§ 17, 18. The only penalty which could be imposed was removal from office. *Id.* § 19. Both processes were too cumbersome and removal from office was too draconian a penalty for either to be an effective means of dealing with allegations of judicial misconduct, as is demonstrated by the fact that no impeachment or removal from office proceedings were held in the eighty years that these remained the exclusive remedies under the constitution.

In 1971, the legislature enacted the Judges' Retirement Act, section 38 of which established a Commission on Judicial Qualifications. Ch. 113, 1971 Utah Laws 412. The section was amended in 1975 and repealed and reenacted as the Judicial Qualifications Commission Act in 1977. *See* ch. 92, 1975 Utah Laws 374; ch. 145, 1977 Utah Laws 636.

In 1984, as part of the revision of the Judicial Article of the Utah Constitution, a provision was added creating the Judicial Conduct Commission. The provision was approved by the voters in November of 1984 and became effective on July 1, 1985. The aim was to provide a specialized and flexible means for disciplining judges, one that would be more effective than the empty threats of impeachment and removal from office. The current version of the provision reads:

A Judicial Conduct Commission is established which shall investigate and conduct confidential hearings regarding complaints against any justice or judge. Following its investigations and hearings, the Judicial Conduct Commission may order the reprimand, censure, suspension, removal, or involuntary retirement of any justice or judge for the following:

(1) action which constitutes willful misconduct in office;

(2) final conviction of a crime punishable as a felony under state or federal law;

(3) willful and persistent failure to perform judicial duties;

(4) disability that seriously interferes with the performance of judicial duties; or

(5) conduct prejudicial to the administration of justice which brings a judicial office into disrepute.

Prior to the implementation of any commission order, the Supreme Court shall review the commission's proceedings as to both law and fact. The court may also permit the introduction of additional evidence. After its review, the Supreme Court shall, as it finds just and proper,

issue its order implementing, rejecting, or modifying the commission's order. The Legislature by statute shall provide for the composition and procedures of the Judicial Conduct Commission.

Utah Const. art. VIII, § 13.

In 1986, the 1971 statute creating the Judicial Qualifications Commission was again amended to reflect changes prompted by the new constitutional provision. Ch. 47, § 78, 1986 Utah Laws 144.

The current statute fixes the composition of the Commission at two members of the House of Representatives, two members of the Senate, three members of the board of commissioners of the Utah State Bar ("Bar"), two persons who are not members of the Bar, and one judge of a trial court of record. Utah Code Ann. § 78-7-27. The legislature has also specified procedures to be followed by the Commission, although only in the barest of detail. The Commission may gather evidence in one of two ways: (i) It may conduct an investigation and hold a hearing, or (ii) it may appoint special masters to take evidence and report their determinations to the Commission. *Id.* § 78-7-30(1)-(2). If, after either type of proceeding, the Commission finds good cause, "it shall order the removal, suspension, censure, reprimand, or involuntary retirement of the justice, judge, or justice court judge." *Id.* § 78-7-30(2).

Although the Commission has been in existence in one form or another for some twenty-three years, it has not been particularly visible. Its level of appropriations was initially very low, and as a consequence, it had to make do with a one-person, part-time staff charged with all administrative functions.[2] One formal proceeding resulted in a recommendation for a sanction coming to this court, but that recommendation did not re-sult in a detailed examination of the adequacy of the Commission's practices or procedures because it was not challenged by the judge. Until recently, the Commission lacked any detailed rules describing how such proceedings should be conducted. These deficiencies have recently received attention. In the past few years, an infusion of new resources has permitted the Commission to acquire office space and to hire a full-time executive director and part-time secretarial and investigative staff to perform the Commission's investigatory and prosecutorial functions. *See supra* note 2. During the same period, the Commission adopted rules of procedure. *See* Utah Admin. Office of the Courts, *Compilation of Laws* 53-58 (1995). A 1996 legislative amendment to the Commission's governing statute (which was sought by the Commission) will likely result in further formalization of the procedures by which such proceedings will be conducted.[3]

The very presence of these cases before this court indicates that the Commission is now moving vigorously to perform the functions contemplated by the constitution and the legislature. And the newly energized Commission has done so despite the lack of any opinion from this court interpreting its rather scanty governing constitutional and statutory provisions or the other legal standards which it must apply in its proceedings. The instant cases compel us to issue an opinion clarifying the issues faced by the Commission.

This prologue should explain why these cases present so many issues of first impression concerning the fundamental structure and meaning of the constitutional and statutory provisions governing the Commission, as well as its rules and procedures. In the course of setting forth the basic legal stan-

---

2. The Commission initially received only a $3,500 appropriation. General Appropriation Act, ch. 221, 1971 Utah Laws 627. In 1985, $12,000 was appropriated. Appropriations Act, ch. 267, 1985 Utah Laws 967. Thereafter, the Commission's annual appropriation ranged from $12,000 to $32,000. *See, e.g.,* Appropriations Act, ch. 305, 1992 Utah Laws 1416. However, for the fiscal year beginning July 1, 1995, the Commission's appropriation was increased to $109,000. Appropriations Act, ch. 322, 1995 Utah Laws 1147. For the following fiscal year,

this amount nearly doubled and currently stands at $207,000. Appropriations Act, ch. 346, 1996 Utah Laws ___ (effective July 1, 1996).

3. Effective July 1, 1996, the Commission is required to promulgate its rules in accordance with the Utah Administrative Rulemaking Act. *See* Judicial Conduct Commission—Amendments, ch. 120, 1996 Utah Laws ___ (enacted by H.R. 175, 51st Leg.).

dards applicable to the Commission, this opinion addresses issues either not raised or only briefed in passing by the parties. This is not our usual practice. However, the broad scope of today's opinion is consistent with the provisions of the Utah Rules of Appellate Procedure, which state that when we send a matter back for further proceedings, we "may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case." Utah R.App.P. 30(a). By this opinion, we attempt to resolve much of the uncertainty that surrounds this area of the law and to anticipate problems that may arise on remand.

Turning to the cases before us: We first present the facts that gave rise to these cases and then present our analysis of the applicable legal standards. That analysis begins with a discussion of the appropriate standard of review to be applied in reviewing a Commission order and the burden of proof the Commission must meet to establish its case against a judge. We then analyze the substantive legal standards by which the Commission is to determine whether sanctionable judicial misconduct has occurred, the procedural rights which attach to the Commission's proceedings, and how sanctions for misconduct are to be determined. We conclude with a brief discussion of our decision to keep this court open to the public when we review sanction recommendations of the Commission.

We now set out the facts of each case. For the most part, these facts were found by special masters appointed by the Commission to hear and take evidence and to report to the Commission, all pursuant to section 78–7–30(1) and (2) of the Utah Code. The Commission accepted and adopted the special masters' findings of fact in both cases. We depart from the masters' findings only to supply any facts necessary to a full understanding of the context of each case.

The facts regarding Judge Buckley are as follows: In February of 1990, Robert Newton was cited by the Salt Lake County sheriff's office for driving with a suspended driver's license and driving left of the center line. Newton refused to sign the citation and failed to appear in Riverton City justice court as the citation directed. On April 25, 1990, the Riverton City court clerk prepared an information charging Newton with failure to appear. The clerk personally signed the information and stamped Judge Buckley's name to the attestation clause, which is intended to indicate that the person signing the information had sworn to the truth of the information in a judge's presence. In fact, Judge Buckley had never seen the information, nor had the clerk sworn to its veracity before him. However, in his answer to the Commission's notice of charges, Judge Buckley admitted that he was aware of his clerk's general practice of using his signature stamp to prepare misdemeanor informations.

In August of 1990, the clerk prepared a bench warrant for Newton's arrest pursuant to the information. The stamped signature of Judge Buckley was on the warrant, but it was not signed by him or the clerk. In May of 1993, a Salt Lake County deputy sheriff attempted to serve the bench warrant on Newton. As a result of alleged misconduct during the attempted arrest, a new, unrelated charge was filed against Newton in the third circuit court. Approximately three weeks later, Newton filed a motion in Riverton City court challenging that court's jurisdiction over his person and demanding recall of the outstanding warrant and dismissal of the failure to appear charge. On May 25th, Newton was arrested on the failure to appear warrant and on a warrant stemming from the unrelated third circuit court charge, and he was taken into custody by the Salt Lake County sheriff's office. Sometime before May 27th, a new information was prepared, charging Newton with driving on a suspended driver's license, but the information was neither signed by a complainant nor sworn to before Judge Buckley. On May 27, 1993, Judge Buckley personally signed a bench warrant for the two traffic offenses and the failure to appear charge.

That same day, Newton—already in custody—appeared before Judge Buckley for the purpose of entering a plea on the two traffic offenses listed in the original citation. Newton argued his motion for dismissal and refused to enter a plea. Judge Buckley found

Newton in contempt of court and sentenced him to serve thirty days in jail and to pay a $500 fine because of Newton's repeated refusal to enter a plea and his insistence on arguing the motion to dismiss even after Judge Buckley had denied the motion. Judge Buckley prepared no findings of fact for the contempt conviction, but a handwritten note on the record indicated that the conviction was entered because Newton "would not enter plea—given five separate warnings—a mute plea was entered." Judge Buckley also personally signed a commitment order pursuant to the contempt conviction.

On June 2, 1993,[4] a person claiming to be Newton's attorney called Judge Buckley and asked that Newton be released from the thirty-day commitment.[5] That same day, Judge Buckley ordered his clerk to recall the commitment. The order of recall was signed by the court clerk, the order of release was stamped with Judge Buckley's signature, and both were dated June 2, 1993. Newton was released on June 3rd, having been jailed since May 25th. On June 10th, Newton entered a not-guilty plea to the traffic offenses. On June 23rd, yet another information charging Newton with the two traffic offenses was signed by the Riverton City attorney and Judge Buckley. This new information was dismissed on June 28, 1993.

The Commission charged Judge Buckley with willful misconduct in office and engaging in conduct prejudicial to the administration of justice, in violation of section 78–7–28 of the Code,[6] by (i) allowing the improper issuance of the April 25, 1990, information; the August 7, 1990, warrant; the May 27, 1993, bench warrant and order of commitment; and the June 2, 1993, order of release; (ii) relying on the unsigned, undated information prepared sometime prior to May 27, 1993; and (iii) exceeding his statutory authority to punish contempt with incarceration of no more than five days, Utah Code Ann. § 78–32–10, when he sanctioned Newton to thirty days in jail. In his answer, Judge Buckley acknowledged that the failure to appear information and warrant were improper but said that they were honest mistakes. He also acknowledged that he mistakenly exceeded his authority in sentencing Newton to thirty days in jail. The Commission appointed special masters—a panel composed of judges drawn from courts of record—to hear and take evidence. The masters duly reported their findings of fact to the Commission but expressly declined to reach the question of whether Judge Buckley's conduct constituted "willful misconduct" or "prejudicial conduct." Without any explanation, the Commission's order merely adopted the facts as found by the masters and stated the ultimate conclusion that the conduct in question was both "willful misconduct" and "prejudicial conduct." Having found Judge Buckley guilty of the charges, the Commission ordered that he be publicly censured.

4. The record is unclear as to the date this conversation occurred. June 2nd was the only date referred to in the hearing before the masters. However, in an affidavit attached to Judge Buckley's motion requesting that this court consider additional evidence, Judge Buckley stated that the conversation occurred on May 28th.

5. The record is also unclear as to the person's reason for requesting Newton's release. Before the masters, Judge Buckley's counsel indicated that the reason given was that Newton was on a hunger strike and that his neighbors were concerned and also were calling Judge Buckley. In his affidavit, Judge Buckley said that the reason given was that Newton was experiencing problems at work and with his health and that he had a number of children who needed him at home. At oral argument before this court, it was suggested that the reason given was the lack of Judge Buckley's authority to impose a thirty-day contempt sentence.

6. The Commission relied on section 78–7–28(1), which provides:

(1) A justice, judge, or justice court judge of any court of this state in accordance with the procedure described in this section, may be removed from office, suspended, censured, involuntarily retired, or publicly or privately reprimanded for:

(a) willful misconduct in office;

(b) final conviction of a crime punishable as a felony under state or federal law;

(c) willful and persistent failure to perform judicial duties;

(d) disability that seriously interferes with the performance of judicial duties;

(e) conduct prejudicial to the administration of justice which brings a judicial office into disrepute.

Utah Code Ann. § 78–7–28(1).

At the hearing before this court, Judge Buckley did not dispute the facts which formed the basis of the charges, as found by the special masters and adopted by the Commission, but he asserted that the misconduct did not rise to the level of "willful misconduct in office" and, accordingly, that the proposed sanction was too harsh for a mere finding of "conduct prejudicial to the administration of justice."

The facts regarding Judge Worthen's conduct are as follows: Lehi City police cited Libby Drew, known to Judge Worthen to be the daughter of his clerk, for driving under the influence ("DUI") on January 18, 1983. Drew had previously been convicted of DUI in 1979 and of driving on a suspended license in 1982 and had been cited for speeding three times prior to the 1983 DUI citation. Appearing before Judge Worthen in the Lehi City justice court on January 24, 1983, she entered a guilty plea to the reduced charge of drinking while driving, pursuant to a plea agreement with the city prosecutor. Judge Worthen sentenced her to ninety days in jail but suspended the sentence and placed her on one year's probation on condition that she have no additional alcohol convictions. In 1992, after Drew had received four additional speeding citations since her 1983 DUI conviction, Lehi City police cited her for speeding, to which she pleaded guilty. The Commission's investigator claimed that neither of the Lehi City DUI citations was reported to the Utah Drivers License Division ("Division"). The masters noted that Judge Worthen did not stipulate to this point, and they did not resolve the issue of whether the citations were reported.

On September 26, 1992, Tosha Harris, known to Judge Worthen to be the granddaughter of his clerk, received a speeding ticket. That same day, Judge Worthen accepted Harris's guilty plea but agreed to hold it in abeyance for six months and ordered Harris to serve eight hours of community service. The citation, however, indicates that Harris was convicted on May 17, 1993. The citation was not reported to the Division.

In addition to the above incidents, between 1989 and 1993 the convictions in Judge Worthen's court of ten other individuals for DUI and/or driving on a suspended license either were never reported to the Division or were reported up to one year late. In some of these instances, the defendants had one or more prior DUI convictions. In three of the instances where DUI convictions were not reported to the Division, Judge Worthen had agreed to hold the offenders' guilty pleas in abeyance for periods ranging from six months to one year, under certain conditions. In one of those three instances, the offender failed to satisfy Judge Worthen's condition that he pay a fine. Judge Worthen then told his clerk to report the conviction to the Division. The Division received the report one year later, and the conviction reported was for failure to appear rather than for DUI. In one instance where a DUI conviction was reported, the offender's jail sentence was backdated by several weeks and the offender's additional conviction of driving on a suspended license was never reported. In addition, Judge Worthen's court filed required monthly reports and financial reports late and failed to make some money deposits in a timely fashion.

The Commission charged Judge Worthen with willful misconduct in office, conduct prejudicial to the administration of justice, and willful and persistent failure to perform his judicial duties, all in violation of section 78-7-28 of the Utah Code, by (i) failing to report convictions and to forward drivers' licenses to the Division; (ii) holding DUI convictions in abeyance as part of a "private probation program"; (iii) reducing the charges against a person related to court personnel; and (iv) maintaining an inadequate accounting system. As in Judge Buckley's case, the Commission appointed special masters to hear and take evidence, and the masters likewise did not decide the ultimate issues of whether Judge Worthen's conduct constituted "willful misconduct," "willful and persistent failure" to perform his judicial duties, or "prejudicial conduct." The Commission again adopted the masters' findings in toto and, without further elaboration, found Judge Worthen guilty of "willful misconduct" and "prejudicial conduct" but not of "willful and persistent failure to perform."

The Commission ordered that he be publicly censured and suspended for ninety days.

Before this court, Judge Worthen did not dispute the facts upon which the charges are based but maintained that the facts do not support a charge of "willful misconduct in office." He, like Judge Buckley, contended that the recommended sanction was too harsh for "conduct prejudicial to the administration of justice."

The standard of review appropriate to actions of the Commission has yet to be defined. In fixing the appropriate standard of review, we must take into account our relationship to the Commission. This is because standards of review are ·essentially statements about allocations of power: How broad shall the authority of the reviewing entity be to set aside factual or legal determinations of the reviewed entity, and under what circumstances may that authority be exercised? *See State v. Pena,* 869 P.2d 932, 935–39 (Utah 1994). *See generally* Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635 (1971). The Commission's role vis-a-vis this court is to be inferred from the language of the constitution. And, as we explain below, that language makes it clear that this court, not the Commission, has ultimate responsibility for determining both whether conduct that warrants sanctions has been proven and what those sanctions should be.

Although it might appear at first blush that the relationship of this court to the Commission is directly analogous to that of an appellate court to a trial court or to an ordinary administrative agency, closer examination shows those analogies to be off the mark. First, in both instances, the court's or agency's findings and conclusions are not reviewable by an appellate court absent an appeal by one of the parties, and the court or agency order becomes a final enforceable judgment if not timely appealed. In addition, the reviewing court will not take new evidence and will not set aside the findings of fact of the trial court or agency absent a strong showing that they are not supported by sufficient evidence. As for the ultimate conclusions of the trial court or agency, generally speaking, they will not be set aside if they are in accordance with the law and within the scope of discretion that the law bestows on the court or agency to fashion a remedy.

Comparison with the Commission is instructive. The constitution provides that upon "complaint[ ] against any justice or judge" the Commission is assigned the responsibility of performing an investigation, considering the evidence at a hearing, and thereafter, entering an order of sanctions. Utah Const. art. VIII, § 13. But while the constitution speaks of the Commission's entering an "order," that term is a misnomer, for the Commission's "order" is quite unlike the order of a trial court or the usual administrative agency because the Commission's order has no effect whatsoever unless it is first reviewed by this court *and* this court determines to enforce it. *Id.* Moreover, this court has no option but to review Commission proceedings, not just as to law, but also as to fact. The constitution is explicit that "[p]rior to implementation of any commission order, the Supreme Court *shall review* the commission's proceedings *as to both law and fact.*" *Id.* (emphasis added). In conducting the factual review, this court is not limited to the evidence taken before the Commission but "may also permit the introduction of additional evidence," *id.,* thus freeing it to reach different factual conclusions than the Commission. As to the Commission's legal conclusions, the constitution gives this court complete discretion to accept, reject, or modify the Commission's proposed order of sanctions; we are not limited to considering whether the sanctions are lawful. "After its review, the Supreme Court shall, *as it finds just and proper, issue its order implementing, rejecting, or modifying the commission's order.*" *Id.* (emphasis added).

We have canvassed other situations where this court is given unusually broad authority in reviewing an agency's actions in hope of finding an analogous power relationship that will help us determine the appropriate standard of review. We have also looked to other states to the extent that their judicial discipline machinery provides analogues. The standard of review we adopt should not

make the Commission a mere factotum, lacking real power and without a significant role to play in the judicial discipline process. But it must also recognize that the constitution vests ultimate responsibility with this court for the regularity of the proceedings, the sufficiency of the evidence, and the suitability of sanctions. This is appropriate when the proceedings at issue tread the fine line between appropriately disciplining judges for behaving in a manner inappropriate to their role as members of the judicial branch of government and interfering with their exercise of legitimate judicial discretion, which may result in error and which is a proper subject of appellate review but not of discipline.

We conclude that the most appropriate analogue is the standard of review we have adopted in attorney discipline matters, not because judges are also lawyers, but because this court's relationship to the attorney discipline process approximates its relationship to Commission proceedings.[7] For there, as here, the constitution gives this court the responsibility for ultimately determining the propriety of attorney conduct and the sanctions to be imposed for misconduct, all with relatively little guidance. *See* Utah Const. art. VIII, § 4 ("The Supreme Court by rule shall govern the practice of law, including ... the conduct and discipline of persons admitted to practice law."); *see also Bailey v. Utah State Bar*, 846 P.2d 1278, 1280–81 (Utah 1993) (discussing same); *In re Knowlton*, 800 P.2d 806, 808 (Utah 1990) (same); *In re McCune*, 717 P.2d 701, 704–05 (Utah 1986) (same). Under our attorney discipline standard, we do not overturn factual findings unless they are "arbitrary, capricious, or plainly in error," but we do not defer to the disciplinary tribunal on questions of the appropriateness of the sanctions it recommends. *Knowlton*, 800 P.2d at 808.

In *Knowlton*, we described the reasons for adopting a standard of review in attorney discipline matters that is less deferential than the standard applicable to an administrative agency or a trial court:

[W]e may accord less deference to Board findings because of the unique nature of disciplinary actions and our knowledge of the nature of the practice of law. Although we adopt the "arbitrary" or "capricious" standard for evaluating the factual findings of the Board, we do so only as a general proposition and reserve the right to draw inferences from the basic facts, which may differ from the inferences drawn by the Board.

Moreover, there is a valid distinction for review purposes between the Board's findings and its recommendations. We have observed that "we do not consider the recommendations of punishment made by the Bar to be in the same category as we do their findings of fact, because it is our responsibility to discipline an erring attorney...." We need not, therefore, defer to the Board in deciding what may constitute appropriate discipline. In this regard, it is imperative to bear in mind that the review of attorney discipline proceedings is fundamentally different from judicial review of administrative agency proceedings. The Utah Constitution authorizes this Court's power to regulate the practice of law, and that includes the promulgation of rules of discipline and enforcement of ethical obligations of attorneys.

*Id.* (citations omitted) (quoting *In re Bridwell*, 25 Utah 2d 1, 474 P.2d 116, 116 (1970)); *accord In re Calder*, 795 P.2d 656, 657 (Utah 1990); *In re Hansen*, 584 P.2d 805, 807 (Utah

---

7. In 1993, after public comment, this court adopted new rules for lawyer discipline and disability which rely on district courts, rather than on hearing panels of the Utah State Bar, as triers of fact in cases in which formal complaints against attorneys have been filed. As a result, discipline ordered by a district court is appealable to this court, but only when one of the parties initiates the appeal. *See* Utah Rules of Lawyer Discipline and Disability, Summary. This model was chosen as preferable to other models in terms of economy, efficiency, public access, fairness, and familiarity. We have not yet had the opportunity to address whether this structural change will alter our standard of review for attorney discipline matters. However, we note that these new rules expressly recognize and incorporate this court's "exclusive" constitutional authority for evaluating the conduct at issue as well as the sanctions imposed. *Id.* R. 1 (delineating purpose, authority, scope, and structure of lawyer discipline and disability proceedings).

1978). Courts in some other states have adopted a similar standard of review in judicial misconduct cases. As the Connecticut Supreme Court explained:

"[O]ur review is not de novo. We cannot assess the credibility of witnesses.... Nonetheless, our review must take into account the risk that unfounded charges of judicial misconduct will impair society's interest in an independent judiciary. We must therefore depart from our normal rule of deference to factfinding by trial courts and administrative agencies. We have a nondelegable responsibility, upon an appeal, to undertake a scrupulous and searching examination of the record to ascertain whether there was substantial evidence to support the council's factual findings."

*In re Zoarski,* 227 Conn. 784, 632 A.2d 1114, 1118 (1993) (quoting *Council on Probate Judicial Conduct re James H. Kinsella,* 193 Conn. 180, 476 A.2d 1041 (1984)); *accord Judicial Performance Comm'n v. Walker,* 565 So.2d 1117, 1119 (Miss.1990).

Some might argue that the adoption of this standard, while less deferential to the Commission than the standard ordinarily applicable to trial courts and administrative agencies,[8] is still too deferential. They might contend that the constitution contemplates that we need not defer at all to the Commission on matters of fact or law. *See* Utah Const. art. VIII, § 13. Indeed, the language could be read to require a de novo review of factual questions. The constitution states that the court is to review Commission proceedings "as to both law and fact" and that the court "may permit" the introduction of additional evidence. *Id.* We reject such an argument. Although a standard of no deference on factual questions could be made to harmonize with the language of the constitutional provision, such a reading would not be consistent with the structural relationship of the Commission to this court. First, there is nothing in the constitution that suggests the Commission is to function as a mere evidence collector for this court. Yet that would be precisely its function if we refused it any deference on questions of fact. The constitution and the legislation implementing its directives clearly contemplate that the Commission will have a significant role to play in gathering evidence of judicial misconduct, making determinations of fact, and recommending sanctions to this court. By granting some measure of deference to the Commission's findings of fact, we will be honoring that role. This court can adequately guard against miscarriages of justice and encroachment upon the exercise of legitimate discretion by members of the judicial branch if it reviews the Commission's findings of fact under the less-deferential standard applied in attorney discipline matters.

Second, while the constitution does permit this court to take additional evidence, we have no ready mechanism for doing so. We might choose to consider some additional uncontested evidence submitted by affidavit, but if there were a dispute as to proposed additional evidence, it is most likely that we would simply remand the matter to the Commission for further consideration of evidence and the entry of findings. Therefore, the grant of power to admit additional evidence does not persuade us that we should grant less deference to the Commission in reviewing its factual findings than we grant when reviewing findings in attorney misconduct proceedings.

The foregoing discussion should be sufficient to explain why we also choose not to adopt the even-less-deferential standard of review that a majority of states appear to use when the supreme court reviews the findings and recommendations of a judicial disciplinary panel under a standard of "de novo on

8. Only a few courts have employed a standard for reviewing judicial discipline matters that would apply to administrative agencies or trial courts. A Texas court, for instance, has observed that proceedings before a special master or the Texas Commission on Judicial Conduct are to be conducted as nearly as practicable with the rules of civil procedure, and only legal evidence can be received in such proceedings. Therefore, the court concluded that the findings of a master, later adopted by the commission, are "tantamount to findings of fact filed by a trial judge in a trial without a jury, and as a result, are reviewable as such." *In re Thoma,* 873 S.W.2d 477, 485 (Tex.Rev.Trib.1994). However, very few courts have granted significant deference to the findings of their judicial conduct commissions, and we decline to do so here.

the record." *See, e.g., Judicial Qualifications Comm'n v. Cieminski*, 326 N.W.2d 883, 885 (N.D.1982); *see also* Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* § 13.01, at 427 (2d ed. 1995). This term describes a standard of review first adopted by the California Supreme Court under which the initial tribunal's findings of fact, as well as its conclusions of law and recommendations, are reviewed without any deference. *See Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal.Rptr. 201, 203–04, 515 P.2d 1, 4 (1973); *accord In re Jett*, 180 Ariz. 103, 882 P.2d 414, 416 (1994); *In re Rowe*, 566 A.2d 1001, 1006 (Del.Ct.Jud.1989); *In re Kelly*, 225 Neb. 583, 407 N.W.2d 182, 184 (1987); *In re Nowell*, 293 N.C. 235, 237 S.E.2d 246, 252–53 (1977).[9]

As we observed above, such a standard seems to demean the role of the Commission in the judicial discipline process and is inconsistent with the institutional capabilities of an appellate court. Long history has taught the judiciary that the forum which hears conflicting evidence has a superior capability to resolve factual questions, particularly where witness demeanor is concerned. *See, e.g., Pena*, 869 P.2d at 935–36. There is no reason to ignore that teaching only when dealing with judicial discipline. Moreover, it can be argued that the political function of a judicial conduct commission—to lend neutral credibility to the handling of allegations of misconduct against judges while assuring that judges are subjected to effective and measured discipline, where necessary—requires that the Commission's actions be reviewed by a court with some deference. The members of this court are, after all, judges too.

■ In sum, we will not overturn the Commission's findings of fact unless they are arbitrary, capricious, or plainly in error, but we reserve the right to draw inferences from the basic facts which may differ from the Commission's inferences and grant no deference to the Commission's ultimate decision as to what constitutes an appropriate sanction. This standard of review will provide the nec-

essary flexibility to address the concerns of those courts that employ a less-deferential standard of review in judicial misconduct proceedings—*viz.,* (i) providing a check on an errant commission, and (ii) discharging the court's ultimate responsibility of imposing an appropriate sanction without demeaning the Commission's role in the judicial discipline process.

We now address the burden of proof the Commission must meet to make out its case against a judge. In the cases before us, both the Commission and the judges appear to have assumed that the appropriate evidentiary standard was proof by "clear and convincing evidence," no doubt relying upon California's annunciation of that standard in *Geiler* as appropriate for judicial misconduct proceedings. In *Geiler,* the California Supreme Court reasoned that judicial misconduct proceedings were analogous to attorney misconduct proceedings in which that court had previously adopted the clear and convincing standard. 110 Cal.Rptr. at 203–04, 515 P.2d at 4. Most other courts have followed the California court's lead and have adopted the clear and convincing standard, although with little or no analysis. *See In re Sheffield,* 465 So.2d 350, 355 (Ala.1984); *In re Hanson;* 532 P.2d 303, 307–08 (Alaska 1975); *In re Zoarski,* 632 A.2d at 1118; *In re Rowe,* 566 A.2d at 1006; *Walker,* 565 So.2d at 1119; *In re Kelly,* 407 N.W.2d at 184; *In re Nowell,* 237 S.E.2d at 253–54; *Cieminski,* 326 N.W.2d at 888. The only separate rationale articulated by some of these courts for adopting the clear and convincing standard is that " 'the serious nature of the proceeding in depriving one of a public office ... ought, at the very least, to require proof by clear and convincing evidence.' " *Hanson,* 532 P.2d at 308 (quoting *In re Laughlin,* 153 Tex. 183, 265 S.W.2d 805, 809 (1954)).

In contrast, the Texas Supreme Court has adopted a preponderance of the evidence standard. *In re Brown,* 512 S.W.2d 317, 319–20 (Tex.1974). The court reasoned that

9. Some of these courts seemingly followed the California court's lead simply because it was the first to address this and other issues regarding judicial discipline. "The first judicial standards (or qualifications) commission was established in

California in 1960 (Cal. Const. art. VI, §§ 8, 18). Like many other jurisdictions, North Carolina used the California plan as the model for its own Commission...." *In re Nowell,* 237 S.E.2d at 253.

judicial discipline proceedings are not of a criminal nature and, therefore, all that was necessary was to establish the charges by a preponderance of the evidence. *Id.*

In deciding between these two standards, we observe that attorney discipline proceedings in Utah are governed by the Utah Rules of Civil Procedure, Appellate Procedure, and Evidence. Utah R. Lawyer Discipline & Disability 17(a). In addition, those rules provide, "Formal complaints of misconduct . . . shall be established by a preponderance of the evidence." *Id.* R. 17(b). The only exception to this burden of proof is for interim suspensions when the lawyer "poses a substantial threat of irreparable harm to the public." *Id.* R. 18. In these cases, the motion for interim suspension "shall be established by clear and convincing evidence." *Id.* R. 17(b).

█ We agree with the *Geiler* reasoning that the burden of proof required in attorney discipline proceedings is also appropriate for judicial discipline proceedings because this court has unique responsibility for determining an appropriate sanction in both proceedings. However, in Utah, unlike California, that standard is only a preponderance of the evidence. This leads us to agree with the Texas court's rationale that judicial misconduct proceedings are not substantially different from other administrative proceedings where a preponderance standard is usual. Therefore, we require the Commission to prove its case against a Utah judge by a preponderance of the evidence. It seems reasonable, again by analogy to attorney discipline matters, that there be an exception to this standard in cases where the Commission recommends interim suspension of a judge pending a final discipline order. Then it must prove its case by clear and convincing evidence.

The next issue we address is whether the Commission properly found that Judge Buckley and Judge Worthen committed either "willful misconduct in office" or "conduct prejudicial to the administration of justice which brings a judicial office into disrepute," or both. Because these terms are undefined in the constitutional and statutory provisions governing the Commission, we cannot address the propriety of the Commission's conclusions without first considering their meaning.

█ Here, as in other cases, "[w]hen faced with a question of statutory [or constitutional] construction, we look first to the plain language of the statute [or constitution]." *CIG Exploration, Inc. v. Utah State Tax Comm'n,* 897 P.2d 1214, 1216 (Utah 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 699, 133 L.Ed.2d 656 (1996); *State v. Larsen,* 865 P.2d 1355, 1357 (Utah 1993); *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991). Under our rules of statutory construction, we need not look beyond the plain language of this provision unless we find some ambiguity in it. *Schurtz,* 814 P.2d at 1112. In analyzing a statute's plain language, we must attempt to give each part of the provision a relevant and independent meaning so as to give effect to all of its terms. *Id.; accord Perrine v. Kennecott Mining Corp.,* 911 P.2d 1290, 1292 (Utah 1996). If we find the provision ambiguous, however, we then seek guidance from the legislative history and relevant policy considerations. *World Peace Movement of Am. v. Newspaper Agency Corp.,* 879 P.2d 253, 257–58 (Utah 1994). In addition, " '[i]f doubt or uncertainty exists as to the meaning or application of an act's provisions, the court should analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and purpose.' " *CIG Exploration,* 897 P.2d at 1216 (quoting *Beynon v. St. George–Dixie Lodge # 1743, Benevolent & Protective Order of Elks,* 854 P.2d 513, 518 (Utah 1993)) (additional citation omitted).

█ Although our rules of constitutional construction are not always identical to our rules of statutory construction, our case law confirms that the starting place for analysis of a constitutional provision is the language of the provision in question. *Society of Separationists v. Whitehead,* 870 P.2d 916, 920–21 (Utah 1993). We have also stated that other provisions dealing generally with the same topic, historical evidence, sister-state law, and policy arguments supported by independent research materials assist us in arriving at a proper interpretation of the constitution-

al provision in question. *Id.* at 921 n. 6. "Each of these types of evidence can help in divining the intent and purpose of the framers, a critical aspect of any constitutional interpretation." *Id.*

In accordance with these rules, we begin with the stated grounds available for disciplining a judge under the Utah Constitution. Section 13 of article VIII of the constitution and section 78–7–28(1) of the Utah Code, implementing the constitutional provision, provide the same list of grounds for disciplining a judge. This list consists of five grounds:

(1) action which constitutes willful misconduct in office;

(2) final conviction of a crime punishable as a felony under state or federal law;

(3) willful and persistent failure to perform judicial duties;

(4) disability that seriously interferes with the performance of judicial duties; or

(5) conduct prejudicial to the administration of justice which brings a judicial office into disrepute.

Utah Const. art. VIII, § 13; *see also* Utah Code Ann. § 78–7–28(1).

In the present case, only the first and fifth of these grounds are directly at issue and require explicit definition. However, to assist the Commission in discharging its duties and to help guide judges and the public in evaluating judicial conduct, we undertake to spell out the elements of all these grounds with some particularity, recognizing that further elaboration may be necessary as specific situations are presented for our review. In addition, we observe that some of these grounds parallel specific grounds found in other state constitutions, although no single list is identical to ours. *Compare* Utah Const. art. VIII, § 13 *with* Ariz. Const. art. VI.I, §§ 3, 4 *and* Cal. Const. art. VI, § 18 (Supp.1996) *and* Colo. Const. art. VI, § 23 *and* Del. Const. art. IV, § 37 *and* Tex. Const. art V, § 1–a(6). We look to these parallel provisions and to cases interpreting them as helpful authority in analyzing the provisions of the Utah Constitution. *Society of Separationists,* 870 P.2d at 921 n. 6.

Reviewing first the plain language of the constitution and the statute, we observe that the first two grounds—willful misconduct in office and conviction of a felony—suggest that one or more acts of commission are required. On the other hand, the third and fourth grounds—willful and persistent failure to perform judicial duties and failure to perform because of a disability—suggest that acts of omission will satisfy each. The last ground—prejudicial conduct—suggests no particular type of act, but the effect of the conduct must be to prejudice public esteem for a judicial office.

On their faces, grounds two and four—conviction of a felony and a disability that interferes with judicial duties—are relatively self-explanatory in terms of the type of conduct required to satisfy each factor. Moreover, the required conduct could be entirely collateral or incidental to the holding of judicial office. On the other hand, the first, third, and fifth grounds appear specifically connected to the judicial office.

These general observations suggest that the first ground—"willful misconduct in office"—requires (i) one or more acts of misconduct (ii) committed with a culpable mental state (iii) by a judge in connection with the judicial office—in effect, abuse or misuse of the judicial office. In contrast, the third ground—"willful and persistent failure to perform judicial duties"—requires (i) one or more instances of a failure to act (ii) by a judge with a culpable mental state (iii) in discharging his or her legal or administrative duties—in effect, abdication of the functions expected of a judge. Finally, the fifth ground—"prejudicial conduct"—requires (i) one or more acts, (ii) the effect of which is to bring public disapprobation upon a judicial office.

■ We now move one step beyond this facial reading of the first, third, and fifth grounds for judicial discipline and identify in greater detail the legal elements necessary to establish each ground. We begin with the first ground, "willful misconduct in office." The first and third elements of this ground are relatively straightforward. The first element requires one or more acts of "misconduct," i.e., conduct inappropriate for a

judge—in short, unjudicial conduct. As we have already observed in this opinion, unjudicial conduct does not refer to a judge's mere legal errors, which the appellate process anticipates and is designed to correct. Rather, it refers to behavior that departs from the ethical norms governing judges. In Utah, these norms are spelled out in the canons contained in the Code of Judicial Conduct. Because these canons are specific and provide notice of what conduct and activities are prohibited, and because the Utah Judicial Council has established machinery for judges to seek guidance as to the meaning of these canons in specific situations, Code of Judicial Admin. app. B, there is great merit in defining "unjudicial conduct" and, hence, "misconduct," by reference to the canons.

The third element of the "willful misconduct" ground requires the misconduct to have occurred "in office." We read "in office" as referring to misconduct arising in connection with one of the adjudicative or administrative functions generally associated with a judge. Our reading comports with the plain meaning of the term "in office" and gives a limiting and clarifying characteristic to the first ground for judicial discipline. Taken together, the first and third elements mean that "willful misconduct" is reserved for significant ethical breaches occurring in connection with the judicial office. This is consistent with our facial reading of "willful misconduct in office" and is supported by cases from other jurisdictions whose constitutional or statutory provisions contain this identical ground for judicial discipline. *See, e.g., Dodds v. Commission on Judicial Performance*, 12 Cal.4th 163, 48 Cal.Rptr.2d 106, 111–12, 906 P.2d 1260, 1266 (1995); *see also In re Haddad*, 128 Ariz. 490, 627·P.2d 221, 228–29 (1981); *In re Kelly*, 407 N.W.2d at 185; *In re Nowell*, 237 S.E.2d at 252, 255.

Finally, the second element of the "willful misconduct" ground pertains to the judge's mental state in connection with the misconduct. As the United States Supreme Court has pointed out, " 'willful' is a 'word of many meanings, its construction often being influenced by its context.' " *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (quoting *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943)). Obviously, this court has never attempted to define "willful" in the context of Utah's first ground for judicial discipline. However, we have defined "willful misconduct" in other situations. In *Golding v. Ashley Central Irrigation Co.*, 793 P.2d 897, 901 (Utah 1990), we held that "willful misconduct" in a tort context is not equivalent to gross negligence or reckless indifference, mental states where constructive knowledge suffices for liability. Instead, we held that to prove "willful misconduct," one needs to show that at the time the act in question was done, the defendant " 'must [have been] aware that his [or her] conduct [would] probably result in injury.' " *Id.* (quoting *Atkin, Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 335 (Utah 1985)). We noted that willful misconduct is " 'an aggravated form of negligence, differing in quality rather than in degree from ordinary negligence.' " *Id.* (quoting William L. Prosser, *Law of Torts* § 34, at 184 (4th ed. 1971)). This rejection of constructive knowledge as sufficing for tort liability premised on "willful misconduct" argues against permitting a similar mental state to result in a finding of "willful misconduct" in a judicial discipline context. Otherwise, a judge could have been acting out of the best of motives, could have been negligent only in exceeding his or her powers, and still could be found guilty of "willful misconduct." We think that this result would be anomalous.

Moreover, the absence of a wrongful purpose element would have the potential to bring within the legitimate reach of the Commission many claims that are more appropriate to the appeal process. The offenses that subject a judge to discipline should be defined in such a way as to minimize the potential for overlap between the judicial conduct machinery and the appeal process. For it is worth emphasis that a judge has not behaved improperly simply because he has committed an error. As we noted earlier, the entire appellate process is in place because it is expected that judges will err occasionally, at least in the eyes of the appellate courts. This does not mean that they are not functioning properly as judges, only that they are human beings functioning within a human

institution where different people can see things differently. The Judicial Conduct Commission process cannot legitimately have as a purpose the punishment of those who commit legal error; rather, it must concern itself only with those who behave outside the ethical norms set for judges, and the constitution and implementing statutes and rules must be so construed.

Returning to the question of what should satisfy the "bad faith" requirement, we conclude that a wrongful purpose element should be necessary under any formulation of the test. This obviates the concern in *Golding* that willful misconduct not be defined to encompass mere gross negligence. In addition, once a purpose of misuse of the judicial office is required, that becomes the primary test of "bad faith." As thus formulated, the test for "bad faith" is whether the judge intentionally committed acts, whether within or without the judge's lawful power, which were done for a purpose other than the faithful discharge of judicial duties.

Our reading of "bad faith" is in basic accord with the interpretation given to the term by at least three other jurisdictions. *See In re Jett*, 882 P.2d at 417–18; *In re Kelly*, 407 N.W.2d at 185–86; *Goldman v. Nevada Comm'n on Judicial Discipline*, 108 Nev. 251, 830 P.2d 107, 135 (1992).[10] We therefore hold that to establish the subsidiary element of "bad faith," the Commission must demonstrate that a judge intentionally committed a lawful act for an improper purpose or intentionally committed an unlawful act that the judge knew or should have known to be beyond his or her lawful power and committed the act for an improper purpose.

Thus, the complete articulation of the definition we adopt in Utah for "willful misconduct" in the context of judicial discipline is (i) unjudicial conduct (ii) committed in bad faith (iii) by a judge acting in his judicial capacity, as we have herein defined those elements.

■ We now turn to the definition of the third constitutional ground for judicial discipline, "willful and persistent failure to perform judicial duties." We have not found any case law from other jurisdictions that separately and comprehensively defines the elements of this ground so as to distinguish it from "willful misconduct" or "prejudicial conduct." Nor has the Commission found either of the judges in the cases before us guilty of a willful and persistent failure to act. Therefore, we are writing on something of a blank slate in our effort to give this ground substantive content.

We first direct our attention to the nature of the act required: "failure to perform judicial duties." As we previously observed, this ground refers to an act or acts of omission, not commission. That much is clear from the plain meaning of the words "failure to perform." Next, we must define the term "judicial duties." We choose to look to the Utah Code of Judicial Conduct, a set of rules promulgated by the Utah Judicial Council after opportunity for public comment and debate to guide the ethical conduct of judges, as a source for a definition of "judicial duties." Specifically, we note that canon 3 of the Code of Judicial Conduct states that judges have adjudicative, administrative, disciplinary, and self-disqualification responsibilities. *See* Utah Code Jud.Conduct canon 3. This enumeration gives substance to the words "failure to perform judicial duties" and leads us to conclude that this provision is triggered when a judge has entirely failed to perform one or more of his or her adjudicative, administrative, disciplinary, or self-disqualification responsibilities.

---

10. Our research has revealed only two state courts that dispense with the bad faith requirement for willful misconduct. Reasoning that judges are and must be held to higher standards than laymen, the North Dakota Supreme Court held that for acts to be labeled as willful misconduct, they must simply be a result of the performer's free will, not the result of coercion. *In re Cieminski*, 270 N.W.2d 321, 327 (N.D.1978). The Delaware Court on the Judiciary has likewise not required a finding of bad faith. *In re Rowe*, 566 A.2d at 1006. However, that court noted that a broad definition of willful misconduct was appropriate because, unlike Utah law, the Delaware Constitution allows for judicial discipline only in cases of willful misconduct. Absent the "lesser included offense" of conduct prejudicial to the administration of justice, the court was not persuaded that proof of more than intent or gross unconcern was required by the term "willful." *Id.* at 1007.

We must also address the mental state and the quality of the failure to act that must be shown to invoke this ground for judicial discipline. Under the constitutional and statutory provisions, such a failure to act must be "willful and persistent." Thus, the culpable mental state required for this ground is "willful," the same mental state that is required for the first ground of "willful misconduct." Because "willful misconduct" refers fundamentally to abuse or misuse of the judicial office, we required that the willfulness element be established by a finding of bad faith, i.e., improper purpose. In contrast, the "willful and persistent failure" ground refers fundamentally to abdication of responsibility. Therefore, we do not read it as requiring a finding of bad faith in the sense that the failure to act resulted from an improper purpose. However, consistent with our case law that "willful misconduct" must be distinguished from gross negligence and reckless indifference and with our concern that legal error not be equated with sanctionable misconduct, see *Golding*, 793 P.2d at 901, and our related discussion above, we reject the notion that imputed knowledge alone is enough to satisfy the mental state and hold that the Commission must demonstrate that the judge knew of the duty to act and knowingly failed to perform his or her duties.

There is an additional qualitative element to the offense: the failure must be "persistent." The ordinary definition of "persistent" is "inclined to persist or insist; tenacious of position or purpose; . . . also, enduring; long-continued; constantly recurring." *Webster's New Int'l Dictionary* 1827 (2d ed. 1956). We think this definition is sufficient and add nothing to it. However, the reason for such failure must be other than disability, so as to distinguish this third ground for judicial discipline from the fourth.

In sum, the "willful and persistent failure" ground for discipline refers to situations where a judge knew of the duty to perform judicial responsibilities and knowingly failed to perform them and such failure was persistent.

Finally, we attempt to give some substance to the fifth ground for judicial discipline—"conduct prejudicial to the administration of justice which brings a judicial office into disrepute." As we observed earlier, the descending order of the grounds for sanctions in the constitution suggests that this fifth ground encompasses judicial misconduct that is less egregious than that covered by the first and third grounds and that is not comprehended by the four grounds listed before it. It may be assumed, therefore, that the conduct covered by this ground will be less-easily defined. The first clause states that such conduct must be "prejudicial to the administration of justice." The contemporary definition of "prejudicial" which is applicable here is "[t]ending to injure or impair; hurtful; damaging; detrimental." *Id.* at 1949. The term "administration of justice" has no fixed meaning but connotes the entire range of activities and functions of the judicial system. *See id.* at 34 (defining "administration" in its broadest sense as "the activity of the state in the exercise of its political powers, including the action of the legislative, judicial and executive departments"). Finally, the first clause employs the term "conduct" rather than the term "misconduct" as used in the first ground for judicial discipline, which could, on its face, suggest that the act or acts covered by this ground could be other than a breach of the ethical norms governing judges. However, concerns about limiting the Commission's jurisdiction to matters of misconduct, not legal error, as well as concerns about vagueness and adequate notice, lead us to conclude that the term should carry the same definition we gave to "misconduct," i.e., both grounds require "unjudicial conduct," which we defined as a breach of the ethical canons contained in the Code of Judicial Conduct.

The first clause of the "prejudicial conduct" ground does not, on its face, suggest any particular mental state. However, "prejudicial conduct" differs from "willful misconduct" because it lacks the element of willfulness, which we defined as "bad faith." This suggests that the mental state necessary to satisfy this need be no more than negligence. In addition, "prejudicial conduct" differs from "willful misconduct" in that the unjudicial conduct need not occur "in office." Ac-

cordingly, because "prejudicial conduct" covers negligent conduct that may or may not arise in connection with the judicial office, it necessarily also covers willful misconduct that does not arise in connection with the judicial office. This reading of the first clause of the "prejudicial conduct" ground is mandated by the constitutional requirement that "willful misconduct" apply only to conduct occurring "in office." Utah Const. art. VIII, § 13. Thus, "prejudicial conduct" encompasses either unjudicial conduct committed in a judicial capacity but without bad faith or willful misconduct committed in bad faith but not in a judicial capacity.

The language of the second clause, "which brings a judicial office into disrepute," is more indeterminate. At a minimum, it means that only misconduct which lowers public regard for a particular judicial office is covered because the definition of "disrepute" is "[l]oss or want of reputation; ill character; low estimation; dishonor." *Webster's New Int'l Dictionary* 753 (2d ed. 1956). Thus, a reading of the complete provision suggests that the unjudicial conduct must have the effect of lowering public esteem for a particular judicial office and thus tend to lower public esteem for the entire judiciary so as to reduce its effectiveness.

Cases from other jurisdictions confirm the general structure we read into the fifth ground. These courts are virtually unanimous in holding that this charge encompasses conduct that would not satisfy the elements of the more severe grounds and that it includes merely negligent conduct. As the California Supreme Court recently explained:

> Unjudicial conduct that does not rise to the level of wilful misconduct, either because of a lack of bad faith or because the judge was not acting in a judicial capacity, may nevertheless constitute prejudicial conduct. Prejudicial conduct refers to conduct that "would appear to an objective observer to be not only unjudicial ... but ... prejudicial to public esteem for the judicial office." The conduct, however, need not be notorious. It is enough that the conduct be known to those members of the public who observed it.

*Dodds,* 48 Cal.Rptr.2d at 112, 906 P.2d at 1267 (citations omitted) (quoting *Geiler,* 110 Cal.Rptr. 201, 515 P.2d at 9); *accord In re Zoarski,* 632 A.2d at 1118–19; *In re Kneifl,* 217 Neb. 472, 351 N.W.2d 693, 695–96 (1984). The Mississippi Supreme Court has elaborated:

> "[A] judge may also, through negligence or ignorance, not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute. The result is the same regardless of whether bad faith or negligence and ignorance are involved and warrants sanctions."

*Walker,* 565 So.2d at 1123 (quoting *In re Anderson,* 451 So.2d 232, 234 (Miss.1984)); *accord In re Nowell,* 237 S.E.2d at 255.

In addition, other courts have consistently held that a violation of the Code of Judicial Conduct or its equivalent warrants discipline, even if the violation resulted from mere negligence or ignorance. The Connecticut Supreme Court explained:

> [P]rejudicial judicial conduct ... does not require proof of a wilful violation of the canons of judicial ethics. "Scienter is not essential for the occurrence of an ethical violation. Judges ... are chargeable for deviations from the [statutes] governing their conduct, even though the application of the [statutes] to particular circumstances may not be readily apparent." *Patterson v. Council on Probate Judicial Conduct,* [215 Conn. 553] 577 A.2d 701, 708 (Conn.1990). A judge acting in a judicial capacity may be found to have engaged in prejudicial judicial conduct, although his conduct was undertaken in subjective good faith.... Furthermore, "[t]he fact that a judge receives no personal benefit, financial or otherwise, from his improper handling of a case does not preclude his conduct from being prejudicial to the administration of justice. The determinative factors aside from the conduct itself, are the results of the conduct and the impact it might reasonably have upon knowledgeable observers." *In re Peoples,* [296 N.C. 109] 250 S.E.2d 890 (N.C.1978), *cert. denied sub nom. Peoples v. Judicial Standards Commission of*

*North Carolina,* 442 U.S. 929 [99 S.Ct. 2859, 61 L.Ed.2d 297] (1979).

*Zoarski,* 632 A.2d at 1118–19 (citations and footnote omitted except as indicated).

Consistent with the structure of the grounds for discipline as listed in our constitution and in line with our sister states, we hold that the "prejudicial conduct" ground requires (i) identifying the relevant "unjudicial conduct," and (ii) assessing whether that conduct would appear to an objective observer to prejudice public esteem for the judicial office.

■ Having given some definition to the grounds for discipline, our next task is to evaluate whether the Commission properly found Judge Buckley and Judge Worthen each guilty of "willful misconduct in office" and "conduct prejudicial to the administration of justice which brings a judicial office into disrepute." Utah Const. art. VIII, § 13; Utah Code Ann. § 78–7–28(1). Unfortunately, we find it impossible to perform this task on the basis of the record before us. First, the Commission failed to specify in its notices of charges or its final orders (which incorporated the masters' findings) violations of specific ethical canons, judicial rules, or other laws. In addition, as we explain below, the substance of the Commission's charges and findings is not entirely clear. As a result, we cannot tell precisely what ethical breaches occurred and whether they amount to "willful misconduct" or "prejudicial conduct." Second, the context in which the alleged unjudicial conduct occurred is not dealt with in the Commission's findings, which makes it virtually impossible for us to evaluate whether the alleged misconduct was willful or whether it prejudiced public esteem for the judiciary. Third, the Commission's findings fail to resolve several disputed issues of fact, thus preventing us from determining whether the findings are simply incomplete or whether there was insufficient proof of the Commission's charges. Finally, the Commission failed to explain how the facts as found by the masters logically support the Commission's ultimate conclusions.

We recognize that these are among the Commission's first formal discipline cases and that it has not had the benefit of any interpretation of the governing constitutional and statutory standards it is to apply. As a result, the Commission did not know that it must establish "unjudicial conduct" by reference to the ethical canons contained in the Code of Judicial Conduct and to any underlying statutes and court rules with which the failure to comply constituted an ethical violation. We also recognize that without the benefit of today's decision, the masters asked to find facts for the Commission had no clear legal standard against which to evaluate the facts. Our opinion today should prevent these problems from arising in the future. But whatever the reason, we find it impossible to perform our constitutional and statutory review function on the two records before us. Because of these deficiencies, and because of due process problems we address later in this opinion, we remand these cases to the Commission for further proceedings. To facilitate those proceedings, we set forth the general standard that Commission findings and conclusions must meet, and then we identify some of the specific problems with the Commission's findings and conclusions before us.

■ A general observation about the standard by which the Commission's findings, conclusions, and reasoning will be judged: We expect the Commission's findings to resolve questions of fact and provide an explanation of its assessment of the facts so as to provide a reasoned basis for its decision. There must be an explanation of the linkage between the raw facts and the Commission's ultimate conclusions, including an explanation of why the Commission drew the inferences from the facts that it did. Finally, the Commission must logically link its factual findings and legal conclusions to the recommended sanction order to explain why it chose one sanction over another. These requirements are not out of the ordinary. They are consistent with what we have required of other state agencies. As we explained when describing the obligation of the Public Service Commission to demonstrate the basis for its orders:

The Commission cannot discharge its statutory responsibilities without making findings of fact on all necessary ultimate

issues under the governing statutory standards. It is also essential that the Commission make subsidiary findings in sufficient detail that the critical subordinate factual issues are highlighted and resolved in such a fashion as to demonstrate that there is a logical and legal basis for the ultimate conclusions. The importance of complete, accurate, and consistent findings of fact is essential to a proper determination by an administrative agency. To that end, findings should be sufficiently detailed to disclose the steps by which the ultimate factual conclusions, or conclusions of mixed law and fact, are reached. Without such findings, this Court cannot perform its duty of reviewing the Commission's order in accordance with established legal principles and of protecting the parties and the public from arbitrary and capricious administrative action.

*Milne Truck Lines, Inc. v. Public Service Comm'n*, 720 P.2d 1373, 1378 (Utah 1986).

The value of this requirement is well illustrated in the instant cases. For example, we cannot determine from the materials before us whether the alleged misconduct in these cases constituted unjudicial conduct as we have defined that term or otherwise departed from widespread justice court practice. As a result, we cannot assess whether, under the test for prejudicial conduct, such conduct would appear to an objective observer to have prejudiced public esteem for the judicial office. These same concerns pertain to the Commission's conclusion of willful misconduct because the Commission has failed to specify the relevant unjudicial conduct or to establish that bad faith was involved.

A few specific examples will highlight the problematic nature of the Commission's findings in these cases. In Judge Buckley's case, there is insufficient information about the larger context against which his actions are to be judged. We cannot tell whether his practice of allowing his clerk to sign misdemeanor informations was followed by other justice court judges, because of a lack of clarity in the statutes or because of some other justifiable reason, which may have a bearing on whether his conduct was or was not willful or prejudicial. Whether the practice was widespread may also bear on the level of sanctions to be imposed. Moreover, at Judge Buckley's hearing, the Commission's examiner/prosecutor questioned Judge Buckley about the procedure for handling a traffic citation when the violator refuses to sign the citation, with the implication that a different court procedure is called for in such cases.[11] However, the Commission does not identify what the supposedly proper procedure would be, and we have not been able to find any statute or rule that would call for a different procedure in such cases.

Similarly, to the extent that allegations regarding Judge Buckley's misconduct are premised on violations of technical statutes and court rules, the Commission's notice of charges fails to identify all such statutes and rules, and the Commission's findings do not mention any of them. As a result, we cannot determine which of the numerous factual

---

11. The following questions by the Commission's examiner/prosecutor and answers from Judge Buckley illustrates the tone of the hearing:

Q. When you took the bench you were provided with a handbook, something called a manual, were you not?
A. I was.
Q. And that sets out all of the procedures in— (Inaudible) contact with?
A. That is incorrect.
Q. Does it set out any procedures about issuance of informations?
A. I'm sure it does.
Q. Does it—information concerning traffic citations, unsigned traffic citations?
A. I don't recall.
Q. Have you looked in that book recently?
A. Yes, I have.

Q. Does it tell you anything about what a traffic ticket means?
A. Yes.
Q. Does it tell you about when it's not a signed traffic ticket, what you must do?
A. At the time when I had this issue I really didn't understand that process; I do now. That's why I made the notation in my notes that in any succeeding case that—
Q. For seven years you've had this—you've never looked at it[.] (Inaudible) If you've had a question you've never—
A. That is incorrect.

Needless to say, the record includes no manual as an exhibit to support the examiner's claim, nor have we been able to find any legal authority calling for a different procedure by justice court judges when a violator fails to sign a citation.

findings relate to what violations,[12] and this problem makes it virtually impossible for us to parse the facts and theories which support each of the charges.

 Moving beyond the lack of clarity as to the specific ethical violations at issue, we note again that mere errors of law, such as defects in the procedures followed and the imposition of excessive contempt sanctions, should ordinarily be dealt with through the appeals process. It is true that if a judge persistently commits the same error so as to demonstrate the bad faith necessary to support a charge of willful misconduct or the type of disregard and indifference necessary to support a charge of prejudicial conduct, then invocation of the disciplinary machinery is appropriate. *See, e.g., In re Crowell*, 379 So.2d 107, 110 (Fla.1979); *Goldman v. Nevada Comm'n on Judicial Discipline*, 830 P.2d at 132–36; *Shaman, supra*, § 2.03, at 37–38. But here, the Commission's findings do not explain why Judge Buckley's errors, including his conceded excessive contempt sanction against Newton, rise to the level of ethical misconduct, as opposed to mere errors of law. Moreover, even if Judge Buckley committed an error of law that is sanctionable, detailed information on whether, how, and why the judge corrected the mistake is at least necessary to decide upon a proper sanction. Without factual findings that support each charge and an explanation of the Commission's ultimate conclusion, we cannot appropriately decide whether sanctions are warranted at all and, if so, what the proper sanction should be.

Similarly, in Judge Worthen's case, we cannot analyze his conduct without some explanation of the larger context in which the incidents arose and without findings that relate specific facts to specific violations of ethical canons, statutes, and court rules. Turning first to the Commission's charge that the judge operated his own private pro-

bation program, we note that the practice of justice courts operating their own informal diversion programs was apparently widespread. Memoranda from the court administrator's office to the Judicial Council in May of 1991 and to the circuit and justice court judges in July of 1991 indicate that the informal diversion practices were not in compliance with the diversion statute. According to these documents, justice court judges typically held pleas in abeyance and failed to report traffic convictions. If this was done because of lack of clarity in the statute or because of some other justifiable reasons, then this information is relevant to the issues of willfulness and prejudice and to the issue of the appropriate sanction. The Commission could be claiming that Judge Worthen's conduct was unethical because (i) he participated in the admittedly unauthorized but widespread practice of granting informal diversions (and therefore is being treated somewhat as a scapegoat); (ii) he went beyond even the informal practice by applying it to DUI cases; (iii) he failed to cease the practice after receiving the July 31, 1991, memorandum from the deputy state court administrator; or (iv) some combination of the prior three arguments or some other rationale. None of the contextual facts necessary to support any of these arguments is in the materials before us, nor is the Commission's reasoning apparent. A similar discussion of context is required for the Commission's charges related to Judge Worthen's handling of the case against his clerk's daughter in 1983 and granddaughter in 1992.

The deficiencies noted above make it impossible for us to determine whether either judge committed unjudicial conduct by violating one or more ethical canons. Without establishing that unjudicial conduct occurred, the Commission cannot establish that either prejudicial or willful misconduct occurred. Moreover, even if the findings were sufficient to demonstrate that both judges committed

---

**12.** We note, for example, that the Commission's notice of charges stated that Judge Buckley improperly prepared four documents in the Newton case in violation of rules 3–303 and 4–403(2) and (3) of the Utah Code of Judicial Administration. These rules relate to court clerks' duties and use of a judge's signature stamp. Two of the four documents listed by the Commission, however, were personally signed by Judge Buckley. Because the Commission's subsequent findings fail to relate the facts to the governing statutes and rules, we cannot determine whether the Commission concluded that these two documents were improperly prepared, nor can we determine to what extent the Commission relied on facts surrounding these documents in imposing sanctions.

unjudicial conduct while acting in their judicial capacities, thus satisfying the first and third elements of "willful misconduct in office," the record in each case is currently insufficient to establish the second element of bad faith. For example, although we note that Judge Buckley admitted he was aware of his clerk's habit of using the judge's signature stamp, the masters' findings do not suggest that the practice resulted from an improper purpose. Nor is there any suggestion in the record that the information against Newton—whatever its legal defects—was generated for an improper purpose. Finally, although Judge Buckley concededly exceeded his powers to sanction an individual for contempt, there is again no suggestion in the record that the excessive sanction was imposed for an improper purpose.

In Judge Worthen's case, the special masters noted in a letter accompanying their findings of fact that the record failed to establish, "at least with clarity," the scope of Judge Worthen's administrative duties and whether he was guilty of "simple inattentiveness or intentional withholding" in failing to report convictions to the Division. Before this court, the Commission argues that the masters' findings support an inference that Judge Worthen was intentionally conducting his own private probation program in violation of section 53-3-218 of the Utah Code, which requires courts to forward driver's licenses subject to suspension and to report traffic convictions within ten days of a conviction.[13] The Commission claims Judge Worthen's acts were committed for a purpose other than the faithful discharge of his duties and involved "gross disconcern, bad faith, and knowing misuse of his office." On the other hand, Judge Worthen maintains that the failure to report the convictions was the result of a clerical failure to submit the reports. As noted above, the masters who heard the evidence failed to reach any conclusion. We therefore cannot discern the logical and legal basis for the Commission's ultimate conclusion, particularly given the absence of any consideration of the fact that many justice court judges engaged in similar practices.

Judge Worthen's conduct in the cases of his clerk's daughter and granddaughter is a closer call. The masters noted that while these incidents are "plainly matters of concern ... they may be matters more of a lack of sensitivity than culpability." The Commission noted that it had considered the masters' letter but did not modify its order finding Judge Worthen guilty of willful misconduct in office. However, the order did not explain the basis of the Commission's ultimate conclusion. This is problematic because the stipulated facts indicate that the sentence Judge Worthen imposed in 1983 on his clerk's daughter, Libby Drew, was entered pursuant to a plea agreement she reached with the city prosecutor. In the materials submitted to this court, the Commission argues that Judge Worthen should still have disqualified himself, pursuant to canon 3E(1) of the Code of Judicial Conduct, and that the failure to report Drew's conviction clearly provides a basis for questioning Judge Worthen's impartiality. However, even if Judge Worthen should have disqualified himself solely on the basis of his relationship with Drew's mother, we cannot necessarily agree on the basis of the findings before us that his failure to report Drew's conviction also provides a basis for questioning his impartiality, without some explanation of how this particular instance relates to the widespread justice court practice of operating informal diversion programs.

In the materials submitted to this court, neither party specifically refers to the 1992 incident involving Judge Worthen's clerk's granddaughter, Tosha Harris, in which Judge Worthen held her guilty plea to speeding in abeyance for six months, backdated her citation by eight months, and failed to report the conviction to the Division. Again, these facts could support an inference that Judge Worthen intentionally failed to act in

**13.** We note that the Commission's undated notice of charges, which was served on Judge Worthen on January 13, 1994, referred to violations of sections 41-2-126 and 41-2-127 of the Utah Code. Effective July 1, 1993, however, these sections were amended and renumbered as sections 53-3-218 and 53-3-220, respectively. *See* Act of Feb. 12, 1993, ch. 234, §§ 97, 99, 1993 Utah Laws 1052-53.

an impartial manner and intentionally failed to comply with the reporting requirements of the Utah Code, possibly for the improper purpose of dealing leniently with persons known to the judge. However, without an explanation of the Commission's logical and legal bases of its ultimate conclusion and a delineation of the steps by which it reached that conclusion, we find the issue impossible to review. Simply put, we cannot determine an appropriate sanction for the Drew and Harris incidents because we cannot determine whether the judge should be sanctioned for the failure to disqualify himself, the failure to report the convictions, or both.

■ The problems we have identified with the Commission's findings and conclusions clearly mandate that we remand both cases to the Commission. We emphasize that our discussion is meant to illustrate the problematic nature of the Commission's findings and conclusions and is not meant to provide an exhaustive list of deficiencies. The Commission may well need to address other issues upon remand that we have not raised in this opinion. To provide a more complete understanding of the nature of the remand that we hope will resolve these deficiencies, we must also address the serious due process concerns the proceedings below raise. We acknowledge that these issues have not been briefed, but we think an overview of the due process requirements applicable to the Commission will avoid problems in the future. First, we observe that due process must be provided by the Commission. The relationship of the Commission to this court is not unlike the relationship of any trial court or administrative agency to this court. One of the basic purposes served by our review function of Commission actions is to protect the due process rights to which every citizen of this state is entitled. These rights attach, as our constitution states, whenever a citizen is threatened with deprivation of "life, liberty or property," Utah Const. art. I, § 7, even when the deprivation occurs as a result of administrative action.

Due process rights attach to Commission proceedings because it is empowered to find violations and recommend entry of an order that imposes the ultimate sanction of removing a judge from the bench, as well as lesser sanctions which nonetheless may subject a judge to public stigma and temporary loss of employment. Utah Const. art. VIII, § 13; Utah Code Ann. § 78-7-30. Therefore, the Commission is subject to the constitutional requirements of due process just like the other commissions, boards, and administrative entities of this state.

■ We next address the scope of the rights guaranteed in proceedings before the Commission. Utah's due process clause provides, "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. In *Untermeyer v. State Tax Commission,* we held that Utah's constitutional guarantee of due process is substantially the same as the due process guarantees contained in the Fifth and Fourteenth amendments to the United States Constitution. 102 Utah 214, 129 P.2d 881, 885 (1942). We have delineated these requirements in a variety of contexts, for " '[d]ue process is flexible and calls for the procedural protections that the given situation demands.' " *Labrum v. Utah State Bd. of Pardons,* 870 P.2d 902, 911 (Utah 1993) (quoting *In re Whitesel,* 111 Wash.2d 621, 763 P.2d 199, 203 (1988)). At a minimum, "[t]imely and adequate notice and an opportunity to be heard in a meaningful way are at the very heart of procedural fairness."[14] *Nelson v. Jacobsen,* 669 P.2d 1207, 1211 (Utah 1983); *accord Plumb v. State,* 809 P.2d 734, 743 (Utah 1990); *see also Provo River Water Users' Ass'n v. Morgan,* 857 P.2d 927, 934 (Utah 1993). We have also held that *"every person* who brings a claim in a court or at a hearing held before an administrative agency has a due process right to receive a fair trial in front of a fair tribunal." *Bunnell v. Industrial Comm'n,* 740 P.2d 1331, 1333 (Utah 1987) (emphasis added).

14. We emphasize that these are minimum requirements. Other requirements may attach, for instance, at the investigation stage if the possibility exists that a criminal action might be filed or a criminal conviction secured and an answer of a person being interrogated by the Commission might incriminate that person. *See In re Criminal Investigation, 7th Dist. Ct. No. CS–1,* 754 P.2d 633, 645 (Utah 1988).

For instance, when an inmate appears at a hearing in front of the board of pardons for the first time, we have determined that he or she is entitled to know what information that board will be considering with enough advance notice to enable the inmate to prepare a response and rebut inaccurate information. *Labrum,* 870 P.2d at 909. When citizens protest their tax assessments before the Utah State Tax Commission, we will not sustain commission rulings when they lack necessary predicate factual findings. *Jensen v. State Tax Comm'n,* 835 P.2d 965, 971 (Utah 1992). Likewise, Utah's appellate courts have never hesitated to consider claims alleging due process violations when professionals risk losing their professional license or means of employment through the action of a public disciplinary body. *See, e.g., In re Schwenke,* 849 P.2d 573, 576 (Utah 1993) (attorney's license); *Anderson v. Public Serv. Comm'n,* 839 P.2d 822, 825 (Utah 1992) (license to carry passengers for hire); *Tolman v. Salt Lake County Attorney,* 818 P.2d 23, 28 (Utah.Ct.App.1991) (public employment); *Kirk v. Division of Occupational & Professional Licensing,* 815 P.2d 242, 244 (Utah.Ct.App.1991) (dentist's license); *D.B. v. Division of Occupational & Professional Licensing,* 779 P.2d 1145, 1149 (Utah.Ct.App. 1989) (social worker's license). Judges are entitled to the same basic due process protections afforded to these other professionals because these protections are, indeed, fundamental rights which inure to the benefit of every citizen of this state.

 Having said that notice is required, the question becomes the type of notice required for Commission proceedings. The Commission has established written rules governing notice. *See* Utah Admin. Office of the Courts, *Compilation of Laws* 53–58 (1995) [hereinafter Commission Rule(s) ]. Commission Rule 5 requires that the Commission notify a judge that a preliminary investigation has commenced, the nature of the charge, the identity of the person who made a verified complaint, if any, or that the investigation began on the Commission's own motion, and allow the judge to present such matters as he or she may choose. *Id.* at 54. This is problematic in that the language of Commission Rule 5 providing that the Commission "may make ... a preliminary investigation on its own motion" exceeds the Commission's grant of authority by article VIII, section 13 of the Utah Constitution, which merely permits the Commission to "investigate and conduct confidential hearings *regarding complaints* against any justice or judge." (Emphasis added.) We therefore strike all references to the Commission's acting upon its own motion. Nevertheless, if upon receiving a verified complaint the Commission concludes that it should commence formal proceedings, Commission Rule 6 requires the Commission to provide written notice of that fact to the judge. Subsection (b) of rule 6 states:

> The notice shall specify in ordinary and concise language the charges against the judge, the alleged facts upon which such charges are based, and shall advise the judge of the right to file a written answer to the charges within 15 days after service of the notice upon the judge.

*Id.*

 Other than the scope of authority problem in Commission Rule 5, we find nothing lacking in the text of these rules. However, their implementation is critical. In this case, we think that these rules, properly and constitutionally construed, were not complied with. "[W]here notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him ... a party is deprived of due process." *Nelson,* 669 P.2d at 1212. Thus, to satisfy due process, a hearing " 'must be prefaced by timely notice which *adequately informs the parties of the specific issues they must prepare to meet.*' " *Id.* at 1213 (emphasis added) (quoting *State v. Gibbs,* 94 Idaho 908, 500 P.2d 209, 215 (1972)). Moreover, " '[d]ue process' is not a technical concept that can be reduced to a formula with a fixed content unrelated to time, place, and circumstances. Rather, 'the demands of due process rest on the concept of basic fairness of procedure and demand a procedure appropriate to the case and just to the parties involved.' " *Id.* (quoting *Rupp v. Grantsville City,* 610 P.2d 338, 341 (Utah 1980)). The most troubling aspect of the deficiencies we have identified in the cases

before us is the lack of specificity in the formal notice and at the hearings regarding the governing legal and ethical standards and the rules or laws the judges allegedly violated. We are firmly convinced that if we are unable to discern the specific nature of the Commission's charges after it has rendered its order, the judges in these cases received insufficient notice of the charges against them before their hearings.

To meet minimum due process requirements, the Commission's notice of formal proceedings must set forth the applicable provisions of the Code of Judicial Conduct alleged to have been violated. Further, in cases such as these where the ethical violation allegedly results from underlying violations of statutes and court rules, the Commission must identify these statutes and rules within the notice. This information is critical because it identifies the substance of the Commission's complaint against a judge. In addition, the notice must be framed in terms of the elements necessary to prove the charges made in the context of the facts alleged.

Wholly apart from these due process questions, we note a failure by the Commission to comply with its own rules in respects central to our ability to fulfill our constitutional and statutory duty to review its proceedings. Article VIII, section 13 of the Utah Constitution and section 78–7–30(4) of the Utah Code both require this court to review the Commission's proceedings as to both law and fact. That is impossible unless we have a transcript. Commission Rule 20 provides, "If the Commission orders censure, reprimand, suspension, removal, or retirement, *the Commission shall prepare a transcript* of the evidence and of all proceedings therein...." Commission Rule 20, at 57 (emphasis added). Despite this rule, we received only five cassette tapes and no transcript of the hearing in Judge Worthen's case. We received a transcript of Judge Buckley's hearing attached to his motion to this court requesting consideration of additional evidence and oral argument, which we suspect he may have prepared at his own expense. In the future, the Commission must follow its own rules and supply "a transcript of the evidence and of all proceedings therein" to this court as part of the record of its proceedings when it orders a sanction.

Finally, we observe that other materials should be part of the record submitted to this court after the Commission enters an order imposing sanctions. Both of the current records include (i) the Commission's formal notice of charges, (ii) exhibits introduced at each hearing, (iii) the Commission's conclusions and findings, and (iv) a certificate indicating delivery of each record to this court. One record also includes an answer to the Commission's notice of charges, and the other includes a certificate of service of the notice and a series of stipulated facts. Missing from both records is the initial complaint which led to the Commission's preliminary investigation and any correspondence or other documents which passed between the Commission and each judge, including letters which may have explained the charges, affidavits of witnesses, and the like. To some extent, we are hypothesizing that such materials exist and that the Commission relied on them in framing its orders. If so, these materials should be included in the record submitted to this court. We also note that one record failed to include a certificate of service of the notice. This should also be part of the record. Although we do not require that the Commission include records of its preliminary investigation in the record submitted to this court, the Commission should keep some record of the investigation in the event that a challenge is made to its investigatory procedures. *Cf. In re Criminal Investigation*, 754 P.2d at 653–55.

We remand these cases to the Commission for further proceedings consistent with this opinion. We recognize that this may require the Commission to start over in order to remedy the deficiencies we noted in the complaint and notice, in the evidence, and in the findings and conclusions. However, that is an unavoidable consequence when all concerned are writing on a clean slate as regards the heretofore uninterpreted constitutional and statutory provisions concerning the Judicial Conduct Commission.

We now turn to the issue of sanctions. In light of our decision to remand these cases, it is premature to address the appropriateness of any sanctions. However, we note that the Commission promulgated guidelines for sanctions on February 7, 1996. We also observe that it did not have the opportunity to apply these guidelines in these cases, because its orders of sanctions were issued before it promulgated the guidelines. Our decision to remand will afford both the Commission and the judges the opportunity to address these guidelines in detail.

We commend the Commission for promulgating these guidelines. Our research indicates that most courts justify a particular sanction in a specific case on an ad hoc basis, that is, by comparing the conduct in the case at issue to the conduct and sanctions imposed in other cases. This ad hoc or developmental approach makes some sense given the wide variation of conduct reported in the cases. However, it tends to produce punishments that lack uniformity and consistency. As Hart observed, "[T]he ideal of justice [is] treating morally like cases alike and morally different ones differently." H.L.A. Hart, *Punishment and Responsibility* 80 (1968). Consideration of the Commission's guidelines over time will help assure that such fairness is realized in Utah sooner rather than later.

■ The last issue we address regards the confidentiality of the Commission's investigations and hearings as well as the hearings before this court. The Utah Constitution provides that the Commission "shall investigate and conduct *confidential* hearings regarding complaints against any justice or judge." Utah Const. art. VIII, § 13 (emphasis added). Section 78–7–30 of the Utah Code provides:

The following documents are privileged in any civil action:

(a) the transmission, production, or disclosure of any complaints, papers, or testimony in the course of proceedings before:

(i) the Judicial Conduct Commission;

(ii) the masters appointed under Subsection (2); or

(iii) the Supreme Court;

(b) any complaints, papers, or testimony may not be disclosed by the commission, masters, or any court until the Supreme Court has entered its final order in accordance with this section, except:

(i) upon order of the Supreme Court;

(ii) upon the request of the judge or justice who is the subject of the complaint; or

(iii) the dismissal of a complaint or allegation against a judge or justice shall be disclosed without consent of the judge or justice to the person who filed the complaint or allegation.

Utah Code Ann. § 78–7–30(6). A plain reading of these provisions indicates that (i) the Commission's hearings must remain confidential and cannot be opened except upon order of this court; (ii) complaints, papers, and testimony related to the matter are to remain confidential until this court has entered an order implementing, modifying, or rejecting the Commission's order, unless we order their release or the offending judge requests their release; and (iii) hearings before this court may be opened to the public if we enter an order to that effect. We note that the Commission's investigations are not made expressly subject to confidentiality, presumably for the sound reason that investigators need to speak to witnesses and gather information.

According to a leading treatise, provisions governing the confidentiality of judicial conduct commissions can be grouped into three categories, with Utah falling in the second:

1) [T]wenty-two states permit public disclosure once a commission, after an investigation and finding of probable cause, files formal charges against a judge;

2) nineteen states permit public disclosure when, after a formal hearing has been held, a commission make[s] a recommendation of discipline to the state supreme court; and

3) nine states and the District of Columbia permit public disclosure only where a supreme court orders a sanction.

Shaman, *supra*, § 13.15, at 463.

Confidentiality is thought to (i) promote the disciplinary process by protecting com-

plainants and witnesses from retribution, harassment, or the possibility of subornation of perjury; (ii) protect innocent judges wrongfully accused; (iii) maintain confidence in the judicial system by avoiding premature disclosure of alleged misconduct; (iv) encourage retirement in place of formal hearings; and (v) protect commission members from outside pressures. *Id.* at 464. The first proposition is probably not relevant to our statutory scheme because in Utah, the justice or judge under investigation "shall be provided with all information necessary to prepare an adequate response or defense, which may include the identity of the complainant." Utah Code Ann. § 78–7–30(1)(b). The second and third propositions aim to protect the judge's privacy interest and to protect against unwarranted damage to his or her reputation. This makes sense given that 75% of judicial complaints nationwide are determined to be either unfounded, frivolous, or lacking proper jurisdiction, and Utah's rate may well prove to be higher over time. We agree that the judge under investigation and the entire judiciary would needlessly suffer if all complaints were disclosed. *See* Shaman, *supra,* § 13.15, at 465, 467. However, our constitutional and statutory scheme avoids these problems by requiring confidentiality until the Commission finds misconduct and enters an order accordingly. Indeed, this measure of confidentiality also satisfies the fourth and fifth propositions, thus permitting speedy and effective resolution of certain cases without the need for formal hearings.

Once the Commission enters an order and the matter has been brought here, however, we see little reason to maintain confidentiality. Confidentiality at this point would not serve any of the stated goals sufficiently to overcome our traditional bias for open court proceedings. *See, e.g., State v. Crowley,* 766 P.2d 1069, 1070 (Utah 1988) ("A similar emphasis on the inherent value of public proceedings is found in this Court's treatment of the right of the public and the press to have access to court proceedings civil and criminal."); *see also State v. Archuleta,* 857 P.2d 234, 238–39 (Utah 1993) (holding that presumptive right of access to documents filed in connection with criminal

preliminary hearing exists). Our order opening the record and the proceedings in these two matters suggests as much, stating as it does that no good cause was shown warranting closure. *See supra* note 1. We emphasize again today that it would take an unusual set of circumstances to justify closure of proceedings before this court.

In sum, we remand these cases to the Commission for further proceedings consistent with this opinion.

HOWE, DURHAM, and RUSSON, JJ., concur.

Associate Chief Justice STEWART does not participate herein.